Laramore, Judge,
delivered the opinion of the court:
This claim has been referred to the court pursuant to House Resolution 235, 86th Congress, 2d. Session.[1]
Under the resolution referring this case a request is made for the court to determine and report to Congress facts relating to delay or laches, whether the bar of the statute of limitations should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy, and conclusions based on such facts as to whether plaintiff’s demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.[2]
The facts are fully found and, respecting the question as to whether plaintiff has a legal claim against the United States, briefly are as follows:
Prior to this congressional reference the plaintiff had, on October 23, 1957, filed a petition in this court asserting a claim based on the same factual situation as is involved in this action. That suit was dismissed by the court for *208 tbe reason that the petition failed to state a claim over which the court had jurisdiction. Catalina Properties, Inc. v. United States, 143 Ct. Cl. 657, 166 F. Supp. 763.
Thus it is clear that, under this court’s former holding, plaintiff has no legal claim against the United States. Plaintiff’s brief is silent on the question of equity as the term is used in law. Consequently we assume its claim is based either on legal grounds or equity as used in the broader sense and as is defined in footnote 2, infra.
We also, from the facts of the case, believe there was no delay in prosecuting not only the former but the instant suit which would constitute laches. The former case was not barred bj? the 6-year statute of limitations, 28 U.S.C. 2501. However, the instant case would be barred thereby, and since ‘we have no authority to waive the limitations statute, we are forced to conclude that this fact is a further bar to recovery based on a legal or, in a jural sense, equitable claim. Under these circumstances, we can find no reason why plaintiff should not be subjected to the statute of limitations. Furthermore, were we to .recommend that the bar of the statute of limitations be removed, the former judgment, as stated earlier, would prevent recovery on legal grounds, and such a recommendation would be a useless gesture.
There remains the question of whether any amounts are equitably due[3] plaintiff from the United States.
Plaintiff’s claim for equitable consideration based on the broad moral sense of justice is not dependent upon the right of defendant to distrain payment or collection of rentals. It can be assumed that defendant had a perfect right to dis-train and levy as it did. However, the question presented is, after so acting, was the Government’s inaction from then on the cause of plaintiff’s loss, if any, and was the inaction of the Government justified by the circumstances involved.
The facts relating to this aspect of the case are summarized as follows: Catalina Properties, Inc., a Florida corporation, was in 1952 the owner of a 99-year leasehold on the Catalina Hotel in Miami Beach, Florida. There were five stockhold *209 ers of the corporation who owned the entire outstanding common stock in the following proportions: Gilbert Smollin, 45%; Charles Goldberg, 25%; Max Marmorstein, 10%; James L. E. Jappe, 10%; and A. N. Jappe, 10%.
In 1947, these five individuals had made their original investment, in the same proportions, in the common stock of a corporation which owned a 30-year lease on the New Surf Hotel in Miami Beach. Subsequently, the stock was traded in for a third mortgage on the 99-year leasehold of the Catalina Hotel. For convenience, the mortgage was held in the name of A. N. Jappe, Trustee, for the five investors whose beneficial interests of ownership of the mortgage were in the same proportions as their previous stock ownership. In April 1951, the mortgage was foreclosed and the 99-year leasehold acquired in the name of A. N. Jappe, Trustee, who filed partnership income tax returns on behalf of the group as a “joint venture” for the years 1951 and 1952.
The tax returns filed by Mr. Jappe, as trustee, disclosed to the Internal Revenue Service the names of the five joint venturees and their proportions of ownership in the venture, Mr. Smollin holding a 45% interest and the remaining four individuals, 56%. Thus, as shown by the findings:
* * * the extent of Mr. Smollin’s ownership in the investment was revealed to the Internal Revenue Service.
In November 1952, the owners of the leasehold felt that the enterprise would be improved as a corporation and that they would be spared the burden of recording its operations in their individual tax returns. For these reasons, Catalina Properties, Inc., was organized and the' 99-year leasehold transferred to it by A. N. Jappe, Trustee, on November' 12, 1952. Its stock was issued to the five investors in their rightful proportions. The trusteeship was terminated as of November 12.
One of the members of the joint venture, Gilbert Smollin, was at the time or had been a betting commissioner. The other four were business and professional men in no way connected with such activities. On November 14, 1952, the Internal Revenue Service filed jeopardy assessments against Gilbert Smollin and his wife for alleged deficiencies in income taxes for the years 1947-1950 in the total amount of $136,879.46.
*210 The Internal Revenue Service was fully aware of the facts of Mr. Jappe’s trusteeship; that Mr. Jappe held the bare title of the leasehold in trust for Mr. Smollin and the others; that Mr. Smollin was the beneficial owner of only 45% of the leasehold, the others owning-55%. Nevertheless, they notified Mr. Jappe that they were issuing a jeopardy assessment against him as a transferee of Mr. Smollin and filed the assessment despite Mr. Jappe’s previous reiteration, at a meeting on November 19, of all of the facts of which they had antecedent knowledge and his protestation that, because of the wide and unfavorable publicity then given to jeopardy assessments, he would sustain embarrassment and irreparable harm if they were filed.
During the meeting of November 19, Mr. Jappe also informed the Internal Revenue agents of the formation of Catalina a week before; the transfer of the leasehold to it by Mr. Jappe, as trustee; and of the receipt by the five joint venturees of corporate stock in the proportions of their beneficial ownership, in the leasehold, Mr. Smollin having acquired 45 of the 100 outstanding shares.
The Internal Revenue Service, on November 26, 1952, issued a jeopardy assessment, in the amount'of $93,096.12 (subsequently reduced to $79,650.08), against Catalina, as transferee of a transferee. On December 12, the Internal Revenue Service filed a tax lien against Catalina’s leasehold estate, and on December 15 served a levy and a warrant of distraint, in the amounts assessed against Catalina, upon the sublessees of Catalina who were operating the hotel under a 7-year sublease extending from December 1,1948, to November 30,1955, with an annual rental of $51,200 payable in installments running from December 15 to March 15.
In his answers to the petitions filed by A. N. J appe, Trustee, and Catalina, in the Tax Court, the Commissioner of Internal Revenue alleged, as the basis of the transferee assessments, the fact that Mr. Smollin had transferred his interest in the leasehold to Mr. Jappe and to Catalina without consideration and that, by reason of the transfer, he had become insolvent and unable to pay the alleged taxes. However, the value of Mr. Smollin’s interest in the leasehold was not diminished by the transfer from A. N. J appe, Trustee, to *211 Catalina. The Catalina common stock issued to Mr. Kohen, but owned by Mr. Smollin, was equivalent in value, on the date of issue, to Mr. Smollin’s beneficial interest in the lease under the trusteeship at the time the trusteeship was terminated.
The assessment, lien and distraint placed Catalina in a precarious situation. The distrained rentals were its sole source of income out of which had to be paid ground rent, first and second mortgages, taxes, insurance and other expenses.
In the levies served upon them the sublessees were notified that Catalina owed the Government taxes in the amount of $93,096.12. By reason of the levy and the accompanying warrants'for distraint, the lessees were directed to pay over all property, rights to property, or moneys in their possession and belonging to Catalina, as well as all money owing by them to Catalina, to the District Director.
On the day of the levy, December 15, the sublessees, through their attorney, sent Catalina a written notice of the service thereof in which they stated they would not, and could not, make payment under the lease pending clarification or disposition of the levy.
Catalina made several attempts, in conferences in Cleveland, Washington and Miami, to have the assessments, lien and distraint removed. They protested the action of, the Internal Revenue Service on the grounds that the value of Mr. Smollin’s interest in the leasehold had not been diminished by the exchange of that interest for shares of stock in Catalina; that although Mr. Smollin had at no time owned more than a 45% interest in Catalina, the Government had impressed a lien upon the entire leasehold to the injury and detriment of the remaining stockholders; that despite the fact that Mr. Smollin’s ownership amounted to only 45%, the Government had levied upon the entire rental due the corporation; that the rental was the sole income of the corporation and was required to pay the ground rent, the first and second mortgages upon the leasehold, taxes, insurance, and other expenses needed to maintain the property, and that if the rentals were not paid, Catalina might lose its entire investment.
*212 Catalina’s protestations had no effect upon the Internal Eevenue Service. The action was in no way modified or retracted; on the contrary, additional distraints were made upon installments of rentals as they matured.
Catalina made further futile efforts to obtain a release of the levy. It delivered to the Internal Eevenue Service Mr. Smollin’s 45 shares of common stock, computed by the Internal Eevenue Service to be worth $56,250. It adopted a resolution that the 99-year leasehold estate would not be further encumbered; that any deficit that occurred would be made up by pro rata contributions from the stockholders out of their separate funds; that no distribution of dividends or profit would be made to Mr. Smollin or any stockholder until Mr. Smollin’s tax liability was determined or paid. It offered the Internal Eevenue Service $25,000 to be applied on whatever tax was found to be due, for the cancellation of the assessments and levies against the sublessees “so that they can pay their lease rent now to Catalina Properties, Inc.” It then offered the Service $56,250, the value it had placed on Mr. Smollin’s interest in Catalina, for the cancellation of the levy on the rentals. All offers were rejected on the ground that the amount offered represented only the value of Gilbert Smollin’s equity in the corporation, whereas the Internal Eevenue Service was asserting that Catalina, as a transferee of a transferee, was liable for, and the Government’s lien covered, the full value of all property received by Cataliiia from A. N. Jappe, Trustee, to the extent required to satisfy the unpaid tax liens, including statutory accruals. -
Failing to have the levies on the rentals released, so that it could collect the rentals, Catalina repeatedly urged the Internal Eevenue Service to do so. From time to time, following the December 15, 1952, levy on the sublessees, Catalina’s representatives urged the Internal Eevenue Service in Florida to collect the rentals coming due under the sublease in the winter season, when the hotel was fully occupied. It is customary in Miami Beach hotel leases to provide, as specified in the Catalina sublease, for the payment of annual rentals during the busy winter season. The sublessees had always paid their rentals promptly. Catalina’s representative pointed out these facts to the officials of the Internal *213 Revenue Service and expressed concern that, if the rentals were not collected during the winter tourist season, there was a good chance that the rentals would never, be collected.
The Internal Revenue Service took no steps to collect the rentals nor did it permit Catalina to do so by removing the levies. Under the terms of their sublease, the sublessees were authorized to apply rentals to the payment of the first and second mortgage obligations, if the obligor, Catalina, defaulted. Accordingly, the sublessees paid the mortgagees $21,774.99. The balance of $29,425.01 of the rentals remained unpaid.
Outside of the hotel income earned during the winter season, the sublessees had no independent assets out of which they could pay rentals.
In September 1953, Catalina, fearing that the sublessees would remain in possession another year without payment of rent, the first installment of which was to become due December 15, filed an eviction suit against them. While the proceedings were pending, Catalina again requested the Internal Revenue Service to lift the levies on the rent, stating that the sublessees might appeal an adverse decision and prolong the litigation for months. It also asked the Service to furnish a witness to testify to the effect that the-Government had made a demand on the sublessees for the rentals. Neither request was granted. The sublessees resisted the eviction proceedings, but a writ of possession was issued on November 13,1953.
In April 1953, Gilbert Smollin, A. N. Jappe, Trustee, and Catalina, had filed suits in the Tax Court for a redetermi-nation of their respective tax liabilities for the years 1947-1950. On September 14, 1953, Catalina submitted a written proposal of settlement, offering to deposit $56,250 to be applied against Mr. Smollin’s deficiencies if the jeopardy assessment and levies against Catalina and Mr. Jappe, as trustee, were removed. Again the offer was rejected.
In May 1955, the income tax liability of Mr. Smollin and his wife was settled for $42,649.64, 35% of the assessed deficiencies, interest and penalties, which was less than the amount previously offered.' The Government thus received payment of the tax. However, Catalina' lost $29,425.01 in *214 rentals. To meet its obligations it bad to borrow this amount.
From the foregoing facts, the conclusion is inescapable that’but for defendant’s action plaintiff could have and would have collected the rentals due from the sublessees. In this connection, it is significant that the sublessees always before had paid the rentals when due. It was only after the distraint that the sublessees failed to pay, and undoubtedly the Government’s levy was the real reason why sublessees failed to pay. In fact, the Internal Eevenue Code expressly prohibited the sublessees from making payment to Catalina and provided a penalty for infraction.[3]
What then could plaintiff have done that it did not do to prevent its loss? In our judgment Catalina did everything required of it and did everything possible to protect itself.
In the fall of 1953 when a prospective purchaser of Catalina’s leasehold on the hotel had been located, its representatives requested the District Director in Cleveland to return Mr. Smollin’s stock certificate so that it could be used as security for a loan, which was then being negotiated. The loan was to provide funds to discharge the jeopardy assessments against Catalina and, thus, to secure a release of the lien on its' property in order that Catalina could convey marketable title. The certificate was returned and the money was raised through Mr. Smollin. On January 4,1954, Catalina paid the Internal Revenue Service $84,882.71, and entered into a collateral agreement with the Appellate Division in Cleveland to the effect that the payment would be treated as having been made by Mr. Smollin and that any excess of the amount paid over the amount eventually determined to be due by Mr. and Mrs. Smollin would be refunded to them. *215 The amount paid by Catalina was the total deficiency which the Government then asserted against Mr. and Mrs. Smollin, less interest thereon prior to the date that Catalina allegedly became the transferee. On February 18, 1954, the Internal Bevenue Service released and discharged the tax lien against Catalina.
Defendant contends that Catalina could have paid the tax and redeemed the rentals. This would have been a perfect solution except for two things. First, Catalina did not owe the tax, it being an obligation of one of its stockholders. Secondly, Catalina did not have sufficient assets to accomplish this.
The Government then contends that Catalina could and should have put up a bond in double the amount of the alleged tax. This was approximately $180,000 and obviously Catalina did not have the assets to accomplish this. The Government then contends that Catalina should have obtained an earlier eviction. In principle this sounds very good, but as is well known, many pitfalls might be encountered before such an eviction could be had, and there is ho real way of knowing exactly how much time or expense would be consumed in such a proceeding.
The Government further contends that Catalina could have filed a suit to enjoin collection of the rentals. However, we know of no authority for injunction in such a situation. As a matter of fact, the Government states in its brief that there is no authority for restraining collection on the basis that the assessment is groundless. Furthermore, undoubtedly a temporary restraining order would have to be supported by a bond and, as stated earlier, Catalina did not have the necessary assets to accomplish this.
As a result of the failure of the sublessees to pay the rental to the Government after the levies had been served upon them, the Government could have filed a suit against the sublessees under section 3710 of the Internal Bevenue Code of 1939 to recover the penalty provided in that law. The Government never instituted such an action.
In addition, the Government could have brought an action in a United States District Court to foreclose its tax lien" *216 on Catalina’s leasehold, or have filed an application to have a receiver appointed to take charge of the hotel and conserve the assets pending an adjudication by the court of the rights of the claimants. As shown in finding 23, the Commissioner of Internal Revenue, in August 1953, rejected the suggestion made by the Florida District Director that either of such actions be taken by the Government.
Therefore, we believe the plaintiff did everything in its power to alleviate the situation and beyond question the inactivity of the Government in failing to collect the rentals from plaintiff’s sublessees, and its failure to proceed expeditiously, was the sole cause of plaintiff’s loss which resulted from its inability to collect the rentals during the period when the tourist season was at its height.
Consequently, it is our opinion that plaintiff is equitably due the sum of $29,425.01, which is the amount of the rentals lost by reason of defendant’s inaction. Therefore, pursuant to the request contained in House Resolution 235 we recommend that Congress, in its discretion, pay this amount to plaintiff.
Plaintiff, in its petition and brief, is asking for further sums representing legal fees paid, out-of-pocket expenses, interest on a loan necessitated by its inability to collect rentals, and expenses relating to repairs to the property after it eventually obtained possession. Without discussing each of these items in detail, we find that plaintiff has not established that any of these claimed expenditures was due to the acts or omissions of the defendant, and we are therefore not recommending the payment of any of these additional claims. In fact, no valid reason is proffered in plaintiff’s brief as to why the Government should be required to reimburse plaintiff for these expenditures either in law or equity.
This opinion and the findings of fact, together with the conclusion thereon, will be certified to Congress pursuant to House Resolution 235, 86th Congress, 2d Session.
It is so ordered.
Davis, Judge; Dtjkfee, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
*217 EINDINGS OP PACT
The court, having considered the evidence,, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:[4]
1. Plaintiff is the claimant named in House Resolution 235, 86th Congress, 2d Session, which provides as follows:
Resolved, That the bill (H.R. 6226) entitled “A bill for the relief of Catalina Properties, Incorporated”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and the court shall proceed expeditiously with the same and report to the House, at the earliest practicable date, such findings of fact, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy, and conclusions based on such facts as shall be sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.
The text of H.R. 6226 provides:
A BILL
For the relief of Catalina Properties, Incorporated.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $50,000 to Catalina Properties, Incorporated, in full settlement of all claims against the United States due to the action of officials of the Government of the United States in seizing and rendering worthless valuable rentals owing to said Catalina Properties, Incorporated, from December 1952 to March 1953 upon the Catalina Hotel located in Miami Beach, Florida: Provided, That no part of the amount appropriated in this *218 Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
2. In 1947, five individuals, Gilbert Smollin, Max Mar-morstein, Charles Goldberg, J ames L. E. J appe and A. N. Jappe invested $130,000 in a corporation, Gem Jay, Inc., which owned a 30-year lease on the New Surf Hotel, Miami Beach. Of the $130,000, $50,000 was in payment of common stock of the corporation and $80,000 was loaned to the corporation to bo used as a deposit securing the 30-year lease. The individuals contributed the following proportions of the $130,000: Gilbert Smollin, 45 percent; Charles Goldberg, 25 percent; Max Marmorstein, 10 percent; James L. E. Jappe, 10 percent; and A. N. Jappe, 10 percent. The 100 shares of common stock issued by Gem Jay, Inc., constituting all of the outstanding stock of the corporation, were owned by the five individuals in the proportion of their investments in the company — 45, 25, 10, 10 and 10 percent.
3. Gilbert Smollin’s total investment in Gem Jay, Inc., amounted to $58,500, of which $22,500 represented the purchase price of 45 shares of stock and $36,000 represented a loan to the corporation. The 45 shares of Gem Jay, Inc., stock which were allocable to Smollin’s investment were never actually issued to Gilbert Smollin but were issued in the name of Max Marmorstein. This was done because Mr. Smollin was or had been a betting commissioner. The other investors were business and professional men who were in no way connected with Mr. Smollin’s gambling activities and they did not want the stock to be held openly in the name of a bookmaker. However, and as shown in finding 7, the extent of Mr. Smollin’s ownership in the investment was revealed to the Internal Eevenue Service in the partnership income tax returns which were filed for the years 1951 and 1952. ■ :
4. On June 8,1949, the five investors sold all of their stock in Gem Jay, Inc., for $130,000 to the Truman Hotel Com *219 pany, a Florida corporation which owned the fee in the New Surf Hotel and was the lessor under Gem Jay’s 30-year lease. In payment, the Truman Hotel Company issued a 3-year promissory note for $130,000, secured by a third mortgage on a 99-year leasehold on the Catalina Hotel, Miami Beach, Florida. For convenience, the Agreement of Sale provided that the promissory note be made payable to “A. N. JAPPE, as trustee for the benefit of all of said persons composing sellers as identified and referred to in this agreement”.
5. The Truman Hotel Company defaulted on its promissory note and in April 1951, A. N. Jappe, as trustee for the five investors, acquired legal title to the 99-year leasehold on the Catalina Hotel by foreclosure. Such title was subject to first and second mortgages. Sublessees Louis Braeman and Alexander Heller (hereinafter referred to as the sub-lessees) were in possession of the hotel under a 7-year sublease at the time of the foreclosure. This sublease ran from 1948 to 1955.
6. Following the acquisition of legal title to the 99-year leasehold by A. N. Jappe, Trustee, Mr. Smollin made additional cash contributions so that his total investment in the leasehold amounted to $77,742.42.
7. A. N. Jappe, Trustee, filed partnership income tax returns showing profit and loss accruing to the holders of the 99-year lease on the Catalina Hotel for the taxable periods ended December 31, 1951, and November 12, 1952. These returns disclosed that A. N. Jappe, Trustee, held the leasehold for the “joint venture” and showed the following book values and changes therein with respect to the investments (capital accounts) of the five investors previously named:
Gilbert Smollin Charles Goldberg Max Mar-morstein A. N. Jappe Jamqs It. E. Jappe
Beginning capital. $77,742.42 $43,190.23 $17,276.09 $17,276.09 $17,276.09
1951 loss. (12,032.07) (6,684.48) (2,673.79) (2,673.79) (2,673.79)
Capital, Dec. 31,1952_ 65,710.36 36,505.75 14,602.30 14,602.30 14,602.30
1952 loss (1,148.24) (637.92) (255.16) (255.16) (255.16)
Capital, November 12, 1952. 64,562.12 35,867.83 14,347.14 14,347.14 14,347.14
The items of capital account and profit and loss reflected above represented the same proportions of the total investment in the leasehold as each investor previously had in the *220 stock in Gem Jay, Inc. Although, the book value of Smollin’s 45-percent interest in A. N. Jappe, Trustee, was $64,562.12 as of November 12, 1952, after reduction for losses sustained, his actual cash contributions, or cost basis, for his 45-percent interest totaled $77,742.42.
. 8. On November 12, 1952, the five above-mentioned investors organized the Catalina Properties Corporation and submitted a copy of the Certificate of Incorporation, together with filing fees, to the Secretary of State, Tallahassee, Florida. On November 14, 1952, the Secretary of State notified the Catalina organizers that they had not enclosed the proper amount of filing fees. On November 14, 1952, the Catalina organizers submitted a letter enclosing the correct filing fees, and this letter was received by the Secretary of State on November 17,1952.
9. The newly-formed Catalina Properties Corporation (hereinafter referred to as Catalina) issued 100 shares of common stock to the five investors in the same proportion as each had owned stock in Gem Jay, Inc., and as each had shared in the beneficial ownership of the 99-year Catalina leasehold estate while it had been held in trust by A. N. Jappe, Trustee. The Catalina stock certificates were originally issued on November 13, 1952, at which time Gilbert Smollin’s 45 shares were issued in the name of Herman E. Kohen. On January 20, 1953, the certificate representing Mr. Smollin’s 45 shares, previously issued to Mr. Kohen, was cancelled and a new certificate for 45 shares was issued to Gilbert Smollin.
10. On November 12,1952, A. N. Jappe, Trustee, assigned the 99-year leasehold on the Catalina Hotel to Catalina Properties, Inc., which had been .organized for the purpose of acquiring the lease. The instrument of assignment was filed for record in Hade County, Florida, on November 19, 1952. It was felt by the owners of the leasehold that the operation would be better as a corporation and that the individuals would be spared the burden of recording the operations of the Catalina Hotel in their individual income tax returns.
11. Upon the assignment of the lease, the trusteeship, was terminated. A financial statement prepared by an account *221 ant as of November 12, 1952, contained a “Final Balance Sheet” and “Final Income Statement” of “Joint Venture, A. N. Jappe, Trustee, Catalina Hotel Property, January 1, 1952 to November 12,1952”. The capital accounts and notes payable entries in the balance sheet again showed the respective interest of the five individual investors.
12. For the calendar year 1947, Gilbert Smollin filed an individual Federal income tax return, and for the years 1948-1950, Gilbert Smollin and his wife, May L. Smollin, Gled joint Federal income tax returns.
13. At least one year prior to November 1952, a special agent of the Internal Revenue Service, Intelligence Division, began an investigation of the Federal income tax liability of Gilbert Smollin for the years 1947 through 1950, for the purpose of determining whether there was sufficient evidence to warrant criminal prosecution of Gilbert Smollin for filing false and fraudulent income tax returns. There was no criminal prosecution but, as a result of the investigation, deficiencies in Federal income tax, fraud penalties, and interest were proposed against Gilbert Smollin for the years 1947 through 1950 in the following respective amounts:
Year Deficiency 50 percent penalty Addition to tax Interest
1947. $4,145.90 $971.26 $1,168.35
1948. 35,355.74 003.91 7,775.84
1949. 16,567.16 8,283.58 2,649.61
1950. 17,242.27 8,591.46 1,723.95
On November 14,1952, jeopardy assessments against Gilbert Smollin for the years 1947-50 in the total amount of $136,879.46 were made covering these proposed deficiencies. Following the scheduling of these jeopardy assessments, notices of tax liens against Gilbert Smollin for the years 1947-50 were filed in Cuyahoga County, Ohio, on November 18, 1952, and in Dade County, Florida, on December 3,1952. The validity of the jeopardy assessments against Gilbert Smollin personally are not at issue in this case.
14.On November 14, 1952, the Commissioner of Internal Revenue issued jeopardy assessments, including penalties and interest, against A. N. Jappe, Trustee, as transferee of Gilbert and May N. Smollin, transferors, for the years *222 1947-50, in the aggregate amount of $92,959.15. On November 18,1952, tbe Internal Revenue Service levied on all property, rights to property or money in the possession of A. N. Jappe and belonging to Gilbert Smollin to the extent of $136,879.96.
In his answer to a petition filed by “A. N. J appe, Trustee, Transferee, Gilbert Smollin, Transferor,” in the Tax Court of the United States in April 1953, the Commissioner of Internal Revenue stated that the jeopardy assessments against Mr. Jappe, as transferee, had been made on the following-grounds:
(a) That the Transferor, Gilbert Smollin, during the year ended December 31,1949, subject to the deficiencies and penalties for the taxable year here involved, transferred to A. N. Jappe, Trustee, without consideration, all of his interest m certain real property located in Miami Beach, Florida.
(b) That as of the date of said transfer the fair market value of the aforementioned asset was in excess of the total tax liability, penalties, and interest assessed against the Transferor, in the amount of $8,350.68.
(c) That, at the time of the aforesaid transfer, or as a result thereof, the Transferor, Gilbert Smollin, was, or became insolvent, and unable to pay the deficiency, penalties, and interest here in controversy.
(d) That by reason of the aforesaid transfer without consideration, said A. N. Jappe, Trustee, became and now is liable, as the Transferee of the aforesaid Gilbert Smollin, as provided in Section 311 of the Internal Revenue Code.
15. On November 19, 1952, an Internal Revenue agent in Cleveland, Ohio, called A. N. J appe to his office and presented to him a notice of the assessments against Mr. and Mrs. Smollin, together with notices of the jeopardy assessments against A. N. J appe, as transferee. About a year previously, Mr. Jappe had informed representatives of the Internal Revenue Service in Cleveland as to the facts concerning the trusteeship, and at the November 1952 meeting, he reiterated that Mr. Smollin’s beneficial interest in the 99-year leasehold had only been 45 percent and that four other investors owned the remaining interest. Mr. Jappe vigorously protested the assessments against him as transferee of *223 Mr. and Mrs. Smollin. He stated that he had no property belonging to either of them and that he no longer held the leasehold in trust, but had assigned it about a week previously to the corporation. He also informed the Cleveland agents that Mr. Smollin owned 45 percent of the stock of Catalina and that his interest in the corporation was exactly equivalent to the interest Mr. Smollin had formerly owned in the leasehold. Mr. Jappe also pointed out that because of the wide and unfavorable publicity then being given to jeopardy assessments, he would sustain embarrassment and irreparable harm if the assessments against him were filed.
16. After learning of the transfer of the 99-year lease to Catalina, the Internal Eevenue Service on November 26, 1952, made jeopardy transferee assessments against Catalina, as transferee of A. N. Jappe, Trustee, transferee of Gilbert Smollin, for the years 1947-50, in the total aggregate amount of $93,096.72. Shortly thereafter, on December 2, 1952, the account was transferred from the Cleveland office to the Florida office, of the Internal Eevenue Service for collection, and on December 12, 1952, a notice of tax lien against Catalina in the amount of $93,096.72 was filed in Dade County, Florida. Subsequently, in December 1953, the assessment against Catalina was reduced to $79,650.08 by reason of the elimination of interest accruing in the Smollin deficiency prior to the date of the transfer to Catalina.
17. The value of Mr. Smollin’s interest in the leasehold was not diminished by the transfer from A. N. Jappe, Trustee, to Catalina. The Catalina common stock issued to Mr. Kohen but owned by Mr. Smollin was equivalent in value on the date of issue to Mr. Smollin’s beneficial interest in the lease under the trusteeship at the time the trusteeship was terminated.
18. After the transfer of the Smollin account, the Florida office of the Internal Eevenue Service on December 15, 1952, served a levy, accompanied by warrants for distraint and covering the amounts previously assessed against Catalina,' on the sublessees Louis Braeman and Alexander Heller.
By reason of the levy and the accompanying warrants for distraint, the lessees were directed to pay over all property, *224 rights to property, or moneys in their possession and belonging to Catalina, as well as all money owing by them to Catalina, to the District Director.
As previously stated, the sublessees were in possession of and operating the Catalina Hotel under a 7-year sublease. The sublease had been granted by the 1732 Collins Avenue Corporation, the original lessee of the 99-year leasehold and the predecessor in interest of' Catalina. Catalina had acquired the lessor’s interest in the 7-year sublease in the manner already stated, subject to all rights and liabilities granted or imposed by the sublease between 1732 Collins Avenue Corporation and the sublessees. The sublease, which was in effect at the time Catalina acquired the 99-year leasehold, extended from December 1, 1948 to November 30, 1955, and provided for an annual rental of $51,200 payable in installments running from December 15 to March 15 of each calendar year as follows:
December 15. $5, 000
January 1_ .5, 000
January 20_. 10, 000
February 1_. 10, 000
February 15. 8,000
March 1_ 7,000
March 15_ 6,200
Total_51,200
19. In a number of conferences held with representatives of the Internal Eevenue Service in Cleveland, Washington, and Miami, Catalina protested the assessments, the filing of the lien against its property, and the levy upon the rentals due from the sublessees on the grounds that the value of Mr. Smollin’s interest in the leasehold had not been diminished by the exchange of that interest for shares of stock in Catalina; that although Mr. Smollin had at no time owned more than a 45-percent interest in Catalina, the Government had impressed a lien upon the entire leasehold to the injury and detriment of the remaining stockholders; that despite the fact that Mr. Smollin’s ownership amounted to only 45 percent, the Government had levied upon the entire rental due the corporation; that the rental was the sole income of the corporation and was required to pay the ground rent, the *225 first and second mortgages upon the leasehold, taxes, insurance, and other expenses needed to maintain the property, and that if the rentals were not paid, Catalina might lose its entire investment.
20. By letter of December 30,1952, to the Cleveland Director of the Internal Revenue Service, Mr. Jappe, on behalf of Catalina, proposed that the Director recommend the cancellation of the jeopardy assessments against Catalina, as well as the discharge of the lien upon its leasehold and the levy upon its rental, on condition that Catalina would (1) deliver to the Director for safekeeping the 45 shares of stock issued to Gilbert Smollin, and (2) adopt a resolution to the effect that the 99-year leasehold estate would not be further encumbered, that any deficit that might occur would be made up by pro rata contributions from the stockholders out of their separate funds, and that no distribution of dividends or profit would be made to Mr. Smollin or any other stockholder until Mr. Smollin’s tax liability had been determined and paid.
On January 2, 1953, Catalina’s board of directors passed a resolution which conformed in all respects to the proposal made in Mr. Jappe’s letter, and on January 5, 1953, he delivered a copy of this resolution to the Cleveland Director, together with a certificate of stock representing the 45 shares of Catalina owned by Mr. Smollin. According to a computation made by the Internal Revenue Service, these shares were then worth $56,250. The Director retained Mr. Smollin’s stock but neither the assessment, the lien, nor the levy was cancelled.
21. On December 15, 1952, the same day the levy on the rentals was served on the sublessees, Alexander S. Gordon, attorney for the sublessees, wrote Mr. Jappe, Trustee, that he had advised the sublessees:
to make no payments under the lease by virtue of which they are in possession of the hotel pending clarification or disposition of the aforementioned levy and the above is for your information.
In his letter of December 30, 1952, to the. Cleveland Director, Mr. J appe attached a copy of Mr. Gordon’s letter, together with a copy of a letter to Mr. J appe dated Decern- *226 ber 22, 1952, from Turk & Newman, Catalina’s lawyers in Miami Beach, suggesting that an application be made to the Director “to release the levy pending a determination of the cause since the rental income is all earmarked for the upkeep of superior obligations such as mortgages and insurance and, therefore, in the long run would be for the protection of the Government since failure to pay these sums would result in a foreclosure or a possible loss .by fire or windstorm.”
22. On January 21, 1958, by letter addressed to the District Director of Internal Revenue in Cleveland, Catalina offered the sum of $25,000 for the cancellation or abatement of the assessments, deficiencies, levies and liens against Jappe, Trustee, and Catalina, and the cancellation of the notice of lien filed against the sublessees “so that they can pay their lease rent now due to Catalina Properties, Inc.” The 45 shares of stock were to be returned and the $25,000 applied to Mr. Smollin’s deficiencies. Although some representatives of the Internal Revenue Service in Cleveland recommended acceptance of the proposal advanced by Catalina, it was finally determined to reject the $25,000 offer on the ground that it was considered to be repugnant to law.
23. In March 1953 Catalina’s representatives conferred with two Internal Revenue agents in Miami Beach, who advised that they were receiving bids for the sale of the leasehold. Thereupon, Mr. Jappe, in behalf of Catalina, responded that Mr. Smollin did not own the leasehold but only 45 percent of the stock in Catalina, and that if the Government attempted to sell the hotel, an injunction suit would be filed. The agents then conferred privately and stated that if Catalina would remit $56,250 to be applied to the tax liability of Mr. and Mrs. Smollin, the agents would recommend the cancellation of the lien and levy. On the following morning, Catalina presented an application (on the form which the agents had supplied the previous day), offering the $56,250. However, a telephone call was made on the same day to the District Director in Jacksonville, who informed Catalina’s representatives that the offer would not be accepted by the Internal Revenue Service. On July 6, 1953, the application was forwarded to the Commissioner of In *227 ternal Revenue in Washington, who adopted the District Director’s recommendation that Catalina’s offer be rejected on the ground that the amount offered represented only the value of Gilbert Smollin’s equity in the corporation, whereas the Internal Revenue Service was asserting that Catalina, as a transferee of a transferee, was liable for, and the Government’s lien covered, the full value of all property received by Catalina from A. N. Jappe, Trustee, to the extent required to satisfy the unpaid tax liens, including statutory accruals.
In his letter of rejection, the Commissioner also disapproved the District Director’s suggestion that proceedings be instituted in a United States District Court to foreclose the Government’s liens against the property or to have a receiver appointed to conserve the taxpayer’s assets pending an adjudication by the court of the rights of the respective claimants. The Commissioner made this decision on the ground that actions to determine the outstanding tax liabilities were then pending in the Tax Court.
24. From time to time, following the December 15, 1952, levy on the sublessees, Catalina’s representatives urged the Internal Revenue Service in Florida to collect the rentals coming due under the sublease in the winter season when the hotel was fully occupied. It is customary in Miami Beach hotel leases to provide, as specified in the Catalina sublease, for the payment of annual rentals during the busy winter season. The sublesseees had always paid their rentals promptly. Catalina’s representative pointed out these facts to the officials of the Internal Revenue Service and expressed concern that, if the rentals were not collected during the winter tourist season, there was a good chance that the rentals would never be collected.
25. As previously stated, the initial levy was served on the sublessees by the Internal Revenue Service on December 15, 1952. Similar levies accompanied by warrants for dis-traint were served on the sublessees by the Internal Revenue Service on January 8,1953 and May 26,1953. The successive levies were made because the sublessees’ rental obligation to Catalina accrued in installments between December 15, 1952 and March 15, 1953, whereas each individual levy attached *228 only that portion of the rent which had accrued when the levy was served. On July 23, 1953, Final Notices and Demand, relating to the three preceding levies, were served on the sublessees by the Internal Eevenue Service.
26. Of the total rentals of $51,200 coming due to Catalina between December 15, 1952 and March 15, 1953, under the sublease, the sublessees applied $21,774.99 to payments on first and second mortgages on Catalina’s 99-year leasehold estate. Under the terms of their sublease, the sublessees were entitled to make these payments in the event Catalina, the primary obligor, defaulted, and then apply these payments to the rentals coming due under the sublease. Therefore, the sublessees were not in default on their rental payments until February 1, 1953. The balance of the rental payments aggregating $29,425.01 and coming due under the sublease during the period February 1, 1953 to March 15, 1953, was never paid by the sublessees, either to the mortgagees, "to Catalina, or to the Government.
27. On or after February 1,1953, when the sublessees were in default in the payment of rental to Catalina, it had the choice of pursuing one of the following legal remedies under the laws of Florida:
(1) An action for the recovery of the "past-due installments of rent, the sublessees , remaining in possession of the premises;
(2) a suit for eviction of the sublessees in the Civil Court of Eecord, and
(3) a suit in the Circuit Court, sitting in chancery, for cancellation of the lease; this action is usually accompanied by an application for the appointment of a receiver to take charge of and manage the property pending the litigation.
In 1953, many members of the Florida bench and bar were of the opinion that a suit to recover arrears of rental and an action for eviction were repugnant remedies, and that the bringing of one action precluded the institution of the other.
28. As a result of the failure of the sublessees to pay the rental to the Government after the levies had been served upon, them, the Government could have filed a suit against the sublessees , under Section 3710 of the Internal Eevenue *229 Code of 1939 to recover the penalty provided in that law. The Government never instituted such an action.
In addition, the Government could have brought an action in a. United States District Court to foreclose its tax lien on Catalina’s leasehold, or have filed an application to have a receiver appointed to take charge of the hotel and conserve the assets pending an adjudication by the court of the rights of the claimants. As shown in finding 23, the Commissioner of Internal Revenue, in August 1953, rejected the suggestion made by the Florida District Director that either of such actions be taken by the Government.
29. In September 1953, Catalina feared that the sublessees would remain in possession of the hotel through another winter season without payment of the rental, the first installment of which would become due on December 15, 1953. Therefore, on September 21, 1953, Catalina filed an eviction suit against the sublessees in the Civil Court of Record of Dade County, Florida. In defense, the sublessees pleaded that:
(1) They had not paid the rental because they had been restrained from doing so by reason of the levies served upon them by the Internal Revenue Service, and
(2) that they did not owe Catalina any rental, because Catalina was in violation of the lessor’s covenants in the lease contract to keep the premises in good repair.
30. On October 9,1953, Mr. J appe wrote the Florida District Director of Internal Revenue, notifying him that the eviction action had been filed against the sublessees and stating that Catalina feared that if it was successful in evicting the sublessees, Catalina might have difficulty in collecting the balance of rental then due. The letter also stated that Catalina was concerned about the 1953-54 rental, the first payment of which would become due on December 15, 1953, because, even if Catalina succeeded in the eviction action, the sublessees might appeal the decision and it might take months to determine the matter. He again requested the Government to lift the levies on the rent in order that Catalina could continue to operate. A similar letter was sent to the Washington office of the Internal Revenue Service but the levies were not lifted.
*230 31. In Ms letter of October 9, 1953, Mr. Jappe requested that tlie Jacksonville Director furnish a witness from Ms office to appear in the eviction proceedings scheduled for October 19 and tó testify to the effect that the Government had made a demand upon the sublessees for the rental. A similar request was made by telegram to the national office of the Internal Revenue Service in Washington. The Government refused to furnish such a witness, stating as its reason :
* * * that due to the existing policy and prohibition against appearing in court in connection with proceedings not involving the government, we should not delegate an employee to appear in accordance with your request.'
32. On November 3,1953, the Civil Court of Record made findings that the sublessees’ pleadings failed to state a legal defense to Catalina’s claim, and specifically that Catalina’s alleged failure to keep the premises in good repair was no defense to Catalina’s suit. On the same date, judgment was entered in favor of Catalina for the recovery of the premises. The’sublessees appealed from the judgment to the Circuit Court, which dismissed the appeal on the ground that notice of appeal had not been filed within the time required by law. On November 13, 1953, the Civil Court issued a writ of possession and Catalma recovered the premises in time to collect the winter income.
While the eviction action was pending, the sublessees filed a separate suit in the Circuit Court, sitting in chancery, to enjoin the eviction and for other relief, the sublessees contending that by reason of Catalina’s breach of the covenants to keep the premises in good repair they had incurred expenses required for making such repairs and had lost the rental from a number of hotel rooms. As a prerequisite to the maintenance of tMs action, the sublessees were required by Florida law to post a bond equivalent to the amount of rental due Catalina. Having failed to do so, their action was dismissed on November 3, 1953. The sublessees appealed from the order of dismissal, but the decision was affirmed by the Supreme Court of Florida on December 14, 1951.
*231 33. WMle Catalina’s representatives were engaged in the conferences with Internal Revenue Service representatives in Florida, suits were filed in the United States Tax Court, in April 1953, on behalf of Gilbert and May L. Smollin, A. N. Jappe, Trustee, and Catalina, requesting redetermination of their respective tax liabilities for the years 1947-50 as asserted by the Internal Revenue Service in its prior jeopardy assessments and in the notices of deficiency (90-day letters) sent out in January 1953.
34. On September 14, 1953, after all pleadings in the Tax Court cases had been filed, Catalina submitted a written proposal of settlement to the Appellate Division of the Internal Revenue Service in Cleveland, Ohio, which was handling the Tax Court cases. Catalina offered to deposit with the Commissioner of Internal Revenue the sum of $56,250 to be applied against all deficiencies of income tax penalties and interest legally due by Mr. and Mrs. Smollin with the understanding that:
(1) Stipulations would be entered in the Tax Court cases that A. N. Jappe, Trustee, and Catalina, were not transferees of the assets of the Smollins and that no deficiency in taxes was due from either of them;
(2) that the jeopardy assessments against A. N. Jappe, as trustee, and against Catalina would be cancelled and the liens filed against Catalina’s property would be released;
(3) that the levies on the rentals due Catalina would be cancelled, and that
(4) the Commissioner of Internal Revenue would surrender possession of the certificate issued to Gilbert Smollin for 15 shares of stock in Catalina.
The offer was not accepted by the Internal Revenue Service.
35. In the fall of 1953 when a prospective purchaser of Catalina’s leasehold on the hotel had been located, its representatives requested the District Director in Cleveland to return Mr. Smollin’s stock certificate so that it could be used as security for a loan, which was then being negotiated. The loan was to provide funds to discharge the jeopardy assessments against Catalina and, thus, to secure a release of the lien on its property in order that Catalina could convey *232 marketable title. The certificate was returned and the money was raised through Mr. Smollin. On January 4,1954, Catalina paid the Internal Eevenue Service $84,882.71, and entered into a collateral agreement with the Appellate Division in Cleveland to the effect that the payment would be treated as having been made by Mr. Smollin and that any excess of the amount paid over the amount eventually determined to be due by Mr. and Mrs. Smollin would be refunded to them. The amount paid by Catalina was the total deficiency which the Government then asserted against Mr. and Mrs. Smollin, less interest thereon prior to the date that Catalina allegedly became the transferee. On February 18, 1954, the Internal Eevenue Service released and discharged the tax lien against Catalina.
36. The Tax Court cases were never tried. In May 1955, the cases involving the income tax liabilities of Mr. and Mrs. Smollin for the years 1947-50 were settled pursuant to a stipulation for an amount representing 35 percent of the assessed deficiencies, interest, and penalties, or a total of $42,649.64 and decisions were entered by the Tax Court reflecting this settlement. Stipulations were also entered in the Tax Court cases involving A. N. Jappe, Trustee, and Catalina, as transferees of Mr. and Mrs. Smol-lin, that no liabilities were due from A. N. Jappe, Trustee, or Catalina, as transferees of the Smollins for the years 1947-50, and decisions were entered in the Tax Court to the effect that Catalina had overpaid taxes in the amount of $93,096.72. As a result of this decision, a refund check was sent to Catalina for the $84,882.71 it had paid in January 1954 to obtain a release of the lien on its property.
Following the entry of the stipulated decisions of the Tax Court cases, notices of release of Federal tax lien were delivered to Gilbert and May L. Smollin, A. N. Jappe, Trustee, and Catalina. These notices were subsequently filed for record in the places where the original tax liens had been filed.
37. Catalina’s sole source of income was the rental due from the sublessee and Catalina was dependent on that income to defray its obligations which, as of November 12, 1952, included the ground rent of $10,000 per year, interest of approximately $6,800 on a note secured by the first mort *233 gage on its leasehold, interest of approximately $2,800 on a note secured by the second mortgage on its leasehold, real estate taxes of about $10,000 per annum and annual insurance expenses of about $3,000. The principal amount of the first mortgage was approximately $118,000, and the principal amount of the second mortgage was $15,000; it was due in 1952. The $21,774.99 which the sublessees paid on the first and second mortgages (finding 26) was applied first to the satisfaction of the $15,000 principal due on the second mortgage, plus about $2,000 of accumulated interest; the remainder was applied to the first mortgage, which was payable in installments of $1,500 per month.
38. In connection with the proceedings commenced by Catalina in 1953 to evict the sublessees for nonpayment of rent, Catalina expended approximately $1,000 in legal fees and an additional $100-$125 in out-of-pocket expenses.
39. Primarily because of its failure to receive the balance of the rentals due by the sublessees for the 1952-53 winter season, Catalina found it necessary to borrow $37,600 from A. N. Jappe, one of its stockholders. Of the amount borrowed from Mr. Jappe, $29,425.01 was necessitated by the sublessees’ failure to pay the balance of the rentals due in that amount. Sometime after September 16,1953, Mr. Jappe loaned an additional $12,400 to Catalina. On or about May 18, 1954, Catalina issued its 5 percent promissory note secured by a mortgage in the amount of $50,000 to Mr. Jappe. Interest on the note was later increased to 6 percent, although the exact date when the increase occurred is not disclosed by the record.
40. Except for their income tax returns, the financial records of the sublessees were destroyed prior to the trial of this action. In their partnership income tax returns for 1951, the sublessees reported a rental income of $100,077.84; in 1952, they reported $99,213.72, and in 1953 they reported $86,566.94. The 1953 return included income only from January 1, 1953, until November 13, 1953, when the sub-lessees were evicted from the hotel.
There is no evidence that the sublessees had any independent assets from which rentals could have been collected from them in 1952 and 1953. The balance sheet accompany *234 ing their income tax return for 1953 indicated that they were insolvent at that time.
41. In its fiscal years ended October 31, 1954, 1955, and 1956, Catalina sustained net losses from the operation of the hotel of $38,418.45, $20,384.39, and $8,576.58 respectively.
When Catalina took over the operation of the hotel on November 13, 1953, none of the rooms could be rented to guests, because someone had put ground glass in the sewage system. Catalina’s repair bill during the period from November 13, 1953 to October 31, 1954, was $9,748.48 as compared with the sublessees’ expenditure for repairs in the first 1014 months of 1953 of $1,911.71.

 Resolved, That the bill (H.R. 6226) entitled “A bill for tbe relief of Catalina Properties, Incorporated”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and the court shall proceed expeditiously with the same and report to the House, at the earliest practicable date, such findings of fact, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy, and conclusions based on such facts as shall be sufficient to inform Congress whether the demand is. a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.

 Since the evidence in this case was taken, the findings of the trial commissioner reported, and the case was argued before this court and tentatively decided prior to the decision of the Supreme Court in Glidden v. Olga Zdanok, rendered on June 25, 1962, 370 U.S. 530, we think it proper to file the report without reference to the effect of the Supreme,Court’s opinions in that case.

 We use the phrase “equitably due” not in a strict technical sense but on the broad principles of equity and good conseience. Cuyahoga County, Ohio v. United States, 155 Ct. Cl. 307, 294 F. 2d 775.

 § 3710. Surrender of property subject to distraint—
(a) Requirement.
Any person in possession of property, or rights to property, subject to distraint, upon •which a levy has been made, shall, upon demand by the collector or deputy collector mating such levy, surrender such property or rights to such collector or deputy, unless such property or right is, at the time of such demand,- subject to an attachment or execution under any judicial process.
(b) Penalty for violation.
Any person who fails or refuses to so surrender any of such property or rights shall be liable in his own person and estate to the united States in a sum equal to the value of the property or rights not surrendered, but not exceeding the amount of the taxes (including penalties and interest) for the collection of which such levy has been made, together with costs and interest from the date of such levy.

 On October 23, 1957, plaintiff filed a petition in this court, No. 500-57, asserting a claim arising out of the same factual situation as is involved in this action. The petition was dismissed on defendant’s motion for lack of jurisdiction, 143 Ct. Cl. 657, 166 F. Supp. 763.