**CATALINA PROPERTIES, INC.**

v.

**The UNITED STATES.**

Cong. No. 12–60.

United States Court of Claims.

July 18, 1962.

Rehearing Denied Oct. 3, 1962.

Paul R. Harmel, Washington, D. C., for plaintiff. Geiger, Harmel & Schuchat, Washington, D. C., on the briefs.

S. Laurence Shaiman, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., on the brief.

LARAMORE, Judge.

This claim has been referred to the court pursuant to House Resolution 235, 86th Congress, 2d Session.[1]

Under the resolution referring this case a request is made for the court to determine and report to Congress facts relating to delay or laches, whether the bar of the statute of limitations should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy, and conclusions based on such facts as to whether plaintiff's demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.[2]

The facts are fully found and, respecting the question as to whether plaintiff has a legal claim against the United States, briefly are as follows:

Prior to this congressional reference the plaintiff had, on October 23, 1957, filed a petition in this court asserting a claim based on the same factual situation as is involved in this action. That suit was dismissed by the court for the reason that the petition failed to state a claim over which the court had jurisdiction. Catalina Properties, Inc. v. United States, 143 Ct.Cl. 657, 166 F.Supp. 763.

Thus it is clear that, under this court's former holding, plaintiff has no legal claim against the United States. Plaintiff's brief is silent on the question of equity as the term is used in law. Consequently we assume its claim is based either on legal grounds or equity as used in the broader sense and as is defined in footnote 2, *infra*.

We also, from the facts of the case, believe there was no delay in prosecuting not only the former but the instant suit which would constitute laches. The former case was not barred by the 6-year statute of limitations, 28 U.S.C. § 2501. However, the instant case would be barred thereby, and since we have no authority to waive the limitations statute, we are forced to conclude that this fact is a further bar to recovery based on a legal or, in a jural sense, equitable claim. Under these circumstances, we can find no reason why plaintiff should not be subjected to the statute of limitations. Furthermore, were we to recommend that the bar of the statute of limitations be removed, the former judgment, as stated earlier, would prevent recovery on legal grounds, and such a recommendation would be a useless gesture.

1. *Resolved,* That the bill (H.R. 6226) entitled "A bill for the relief of Catalina Properties, Incorporated", together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and the court shall proceed expeditiously with the same and report to the House, at the earliest practicable date, such findings of fact, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy, and conclusions based on such facts as shall be sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.

2. Since the evidence in this case was taken, the findings of the trial commissioner reported, and the case was argued before this court and tentatively decided prior to the decision of the Supreme Court in Glidden v. Olga Zdanok, rendered on June 25, 1962, we think it proper to file the report without reference to the effect of the Supreme Court's opinions in that case.

There remains the question of whether any amounts are equitably due [3] plaintiff from the United States.

Plaintiff's claim for equitable consideration based on the broad moral sense of justice is not dependent upon the right of defendant to distrain payment or collection of rentals. It can be assumed that defendant had a perfect right to distrain and levy as it did. However, the question presented is, after so acting, was the Government's inaction from then on the cause of plaintiff's loss, if any, and was the inaction of the Government justified by the circumstances involved.

The facts relating to this aspect of the case are summarized as follows: Catalina Properties, Inc., a Florida corporation, was in 1952 the owner of a 99-year leasehold on the Catalina Hotel in Miami Beach, Florida. There were five stockholders of the corporation who owned the entire outstanding common stock in the following proportions: Gilbert Smollin, 45%; Charles Goldberg, 25%; Max Marmorstein, 10%; James L. E. Jappe, 10%; and A. N. Jappe, 10%.

In 1947, these five individuals had made their original investment, in the same proportions, in the common stock of a corporation which owned a 30-year lease on the New Surf Hotel in Miami Beach. Subsequently, the stock was traded in for a third mortgage on the 99-year leasehold of the Catalina Hotel. For convenience, the mortgage was held in the name of A. N. Jappe, Trustee, for the five investors whose beneficial interests of ownership of the mortgage were in the same proportions as their previous stock ownership. In April 1951, the mortgage was foreclosed and the 99-year leasehold acquired in the name of A. N. Jappe, Trustee, who filed partnership income tax returns on behalf of the group as a "joint venture" for the years 1951 and 1952.

The tax returns filed by Mr. Jappe, as trustee, disclosed to the Internal Revenue Service the names of the five joint venturees and their proportions of ownership in the venture, Mr. Smollin holding a 45% interest and the remaining four individuals, 55%. Thus, as shown by the findings:

" * * * the extent of Mr. Smollin's ownership in the investment was revealed to the Internal Revenue Service."

In November 1952, the owners of the leasehold felt that the enterprise would be improved as a corporation and that they would be spared the burden of recording its operations in their individual tax returns. For these reasons, Catalina Properties, Inc., was organized and the 99-year leasehold transferred to it by A. N. Jappe, Trustee, on November 12, 1952. Its stock was issued to the five investors in their rightful proportions. The trusteeship was terminated as of November 12.

One of the members of the joint venture, Gilbert Smollin, was at the time or had been a betting commissioner. The other four were business and professional men in no way connected with such activities. On November 14, 1952, the Internal Revenue Service filed jeopardy assessments against Gilbert Smollin and his wife for alleged deficiencies in income taxes for the years 1947–1950 in the total amount of $136,879.46.

The Internal Revenue Service was fully aware of the facts of Mr. Jappe's trusteeship; that Mr. Jappe held the bare title of the leasehold in trust for Mr. Smollin and the others; that Mr. Smollin was the beneficial owner of only 45% of the leasehold, the others owning 55%. Nevertheless, they notified Mr. Jappe that they were issuing a jeopardy assessment against him as a transferee of Mr. Smollin and filed the assessment despite Mr. Jappe's previous reiteration, at a meeting on November 19, of all of the facts of which they had antecedent knowledge and his protestation that, be-

---

3. We use the phrase "equitably due" not in a strict technical sense but on the broad principles of equity and good conscience.

Cuyahoga County, Ohio v. United States, Ct.Cl., 294 F.2d 775.

cause of the wide and unfavorable publicity then given to jeopardy assessments, he would sustain embarrassment and irreparable harm if they were filed.

During the meeting of November 19, Mr. Jappe also informed the Internal Revenue agents of the formation of Catalina a week before; the transfer of the leasehold to it by Mr. Jappe, as trustee; and of the receipt by the five joint venturees of corporate stock in the proportions of their beneficial ownership in the leasehold, Mr. Smollin having acquired 45 of the 100 outstanding shares.

The Internal Revenue Service, on November 26, 1952, issued a jeopardy assessment, in the amount of $93,096.72 (subsequently reduced to $79,650.08), against Catalina, as transferee of a transferee. On December 12, the Internal Revenue Service filed a tax lien against Catalina's leasehold estate, and on December 15 served a levy and a warrant of distraint, in the amounts assessed against Catalina, upon the sublessees of Catalina who were operating the hotel under a 7-year sublease extending from December 1, 1948, to November 30, 1955, with an annual rental of $51,200 payable in installments running from December 15 to March 15.

In his answers to the petitions filed by A. N. Jappe, Trustee, and Catalina, in the Tax Court, the Commissioner of Internal Revenue alleged, as the basis of the transferee assessments, the fact that Mr. Smollin had transferred his interest in the leasehold to Mr. Jappe and to Catalina without consideration and that, by reason of the transfer, he had become insolvent and unable to pay the alleged taxes. However, the value of Mr. Smollin's interest in the leasehold was not diminished by the transfer from A. N. Jappe, Trustee, to Catalina. The Catalina common stock issued to Mr. Kohen, but owned by Mr. Smollin, was equivalent in value, on the date of issue, to Mr. Smollin's beneficial interest in the lease under the trusteeship at the time the trusteeship was terminated.

The assessment, lien and distraint placed Catalina in a precarious situation. The distrained rentals were its sole source of income out of which had to be paid ground rent, first and second mortgages, taxes, insurance and other expenses.

In the levies served upon them the sublessees were notified that Catalina owed the Government taxes in the amount of $93,096.72. By reason of the levy and the accompanying warrants for distraint, the lessees were directed to pay over all property, rights to property, or moneys in their possession and belonging to Catalina, as well as all money owing by them to Catalina, to the District Director.

On the day of the levy, December 15, the sublessees, through their attorney, sent Catalina a written notice of the service thereof in which they stated they would not, and could not, make payment under the lease pending clarification or disposition of the levy.

Catalina made several attempts, in conferences in Cleveland, Washington and Miami, to have the assessments, lien and distraint removed. They protested the action of the Internal Revenue Service on the grounds that the value of Mr. Smollin's interest in the leasehold had not been diminished by the exchange of that interest for shares of stock in Catalina; that although Mr. Smollin had at no time owned more than a 45% interest in Catalina, the Government had impressed a lien upon the entire leasehold to the injury and detriment of the remaining stockholders; that despite the fact that Mr. Smollin's ownership amounted to only 45%, the Government had levied upon the entire rental due the corporation; that the rental was the sole income of the corporation and was required to pay the ground rent, the first and second mortgages upon the leasehold, taxes, insurance, and other expenses needed to maintain the property, and that if the rentals were not paid, Catalina might lose its entire investment.

Catalina's protestations had no effect upon the Internal Revenue Service. The action was in no way modified or retracted; on the contrary, additional dis-

traints were made upon installments of rentals as they matured.

Catalina made further futile efforts to obtain a release of the levy. It delivered to the Internal Revenue Service Mr. Smollin's 45 shares of common stock, computed by the Internal Revenue Service to be worth $56,250. It adopted a resolution that the 99-year leasehold estate would not be further encumbered; that any deficit that occurred would be made up by pro rata contributions from the stockholders out of their separate funds; that no distribution of dividends or profit would be made to Mr. Smollin or any stockholder until Mr. Smollin's tax liability was determined or paid. It offered the Internal Revenue Service $25,000 to be applied on whatever tax was found to be due, for the cancellation of the assessments and levies against the sublessees "so that they can pay their lease rent now to Catalina Properties, Inc." It then offered the Service $56,250, the value it had placed on Mr. Smollin's interest in Catalina, for the cancellation of the levy on the rentals. All offers were rejected on the ground that the amount offered represented only the value of Gilbert Smollin's equity in the corporation, whereas the Internal Revenue Service was asserting that Catalina, as a transferee of a transferee, was liable for, and the Government's lien covered, the full value of all property received by Catalina from A. N. Jappe, Trustee, to the extent required to satisfy the unpaid tax liens, including statutory accruals.

Failing to have the levies on the rentals released, so that it could collect the rentals, Catalina repeatedly urged the Internal Revenue Service to do so. From time to time, following the December 15, 1952, levy on the sublessees, Catalina's representatives urged the Internal Revenue Service in Florida to collect the rentals coming due under the sublease in the winter season when the hotel was fully occupied. It is customary in Miami Beach hotel leases to provide, as specified in the Catalina sublease, for the payment of annual rentals during the busy winter season. The sublessees had always paid their rentals promptly. Catalina's representative pointed out these facts to the officials of the Internal Revenue Service and expressed concern that, if the rentals were not collected during the winter tourist season, there was a good chance that the rentals would never be collected.

The Internal Revenue Service took no steps to collect the rentals nor did it permit Catalina to do so by removing the levies. Under the terms of their sublease, the sublessees were authorized to apply rentals to the payment of the first and second mortgage obligations, if the obligor, Catalina, defaulted. Accordingly, the sublessees paid the mortgagees $21,774.99. The balance of $29,425.01 of the rentals remained unpaid.

Outside of the hotel income earned during the winter season, the sublessees had no independent assets out of which they could pay rentals.

In September 1953, Catalina, fearing that the sublessees would remain in possession another year without payment of rent, the first installment of which was to become due December 15, filed an eviction suit against them. While the proceedings were pending, Catalina again requested the Internal Revenue Service to lift the levies on the rent, stating that the sublessees might appeal an adverse decision and prolong the litigation for months. It also asked the Service to furnish a witness to testify to the effect that the Government had made a demand on the sublessees for the rentals. Neither request was granted. The sublessees resisted the eviction proceedings, but a writ of possession was issued on November 13, 1953.

In April 1953, Gilbert Smollin, A. N. Jappe, Trustee, and Catalina, had filed suits in the Tax Court for a redetermination of their respective tax liabilities for the years 1947–1950. On September 14, 1953, Catalina submitted a written proposal of settlement, offering to deposit $56,250 to be applied against Mr. Smollin's deficiencies if the jeopardy assessment and levies against Catalina and Mr. Jappe, as trustee, were removed. Again the offer was rejected.

In May 1955, the income tax liability of Mr. Smollin and his wife was settled for $42,649.64, 35% of the assessed deficiencies, interest and penalties, which was less than the amount previously offered. The Government thus received payment of the tax. However, Catalina lost $29,425.01 in rentals. To meet its obligations it had to borrow this amount.

From the foregoing facts, the conclusion is inescapable that but for defendant's action plaintiff could have and would have collected the rentals due from the sublessees. In this connection, it is significant that the sublessees always before had paid the rentals when due. It was only after the distraint that the sublessees failed to pay, and undoubtedly the Government's levy was the real reason why sublessees failed to pay. In fact, the Internal Revenue Code expressly prohibited the sublessees from making payment to Catalina and provided a penalty for infraction.[4]

What then could plaintiff have done that it did not do to prevent its loss? In our judgment Catalina did everything required of it and did everything possible to protect itself.

In the fall of 1953 when a prospective purchaser of Catalina's leasehold on the hotel had been located, its representatives requested the District Director in Cleveland to return Mr. Smollin's stock certificate so that it could be used as security for a loan, which was then being negotiated. The loan was to provide funds to discharge the jeopardy assessments against Catalina and, thus, to secure a release of the lien on its property in order that Catalina could convey marketable title. The certificate was returned and the money was raised through Mr. Smollin. On January 4, 1954, Catalina paid the Internal Revenue Service $84,882.71, and entered into a collateral agreement with the Appellate Division in Cleveland to the effect that the payment would be treated as having been made by Mr. Smollin and that any excess of the amount paid over the amount eventually determined to be due by Mr. and Mrs. Smollin would be refunded to them. The amount paid by Catalina was the total deficiency which the Government then asserted against Mr. and Mrs. Smollin, less interest thereon prior to the date that Catalina allegedly became the transferee. On February 18, 1954, the Internal Revenue Service released and discharged the tax lien against Catalina.

Defendant contends that Catalina could have paid the tax and redeemed the rentals. This would have been a perfect solution except for two things. First, Catalina did not owe the tax, it being an obligation of one of its stockholders. Secondly, Catalina did not have sufficient assets to accomplish this.

The Government then contends that Catalina could and should have put up a bond in double the amount of the alleged tax. This was approximately $180,000 and obviously Catalina did not have the assets to accomplish this. The Government then contends that Catalina should have obtained an earlier eviction. In principle this sounds very good, but as is well known, many pitfalls might be encountered before such an eviction could be had, and there is no real way of knowing exactly how much time or expense would be consumed in such a proceeding.

4. "§ 3710. Surrender of property subject to distraint

"(a) *Requirement.*

"Any person in possession of property, or rights to property, subject to distraint, upon which a levy has been made, shall, upon demand by the collector or deputy collector making such levy, surrender such property or rights to such collector or deputy, unless such property or right is, at the time of such demand, subject to an attachment or execution under any judicial process.

"(b) *Penalty for violation.*

"Any person who fails or refuses to so surrender any of such property or rights shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of the taxes (including penalties and interest) for the collection of which such levy has been made, together with costs and interest from the date of such levy." 26 U.S.C.A. § 3710.

The Government further contends that Catalina could have filed a suit to enjoin collection of the rentals. However, we know of no authority for injunction in such a situation. As a matter of fact, the Government states in its brief that there is no authority for restraining collection on the basis that the assessment is groundless. Furthermore, undoubtedly a temporary restraining order would have to be supported by a bond and, as stated earlier, Catalina did not have the necessary assets to accomplish this.

As a result of the failure of the sublessees to pay the rental to the Government after the levies had been served upon them, the Government could have filed a suit against the sublessees under section 3710 of the Internal Revenue Code of 1939 to recover the penalty provided in that law. The Government never instituted such an action.

In addition, the Government could have brought an action in a United States District Court to foreclose its tax lien on Catalina's leasehold, or have filed an application to have a receiver appointed to take charge of the hotel and conserve the assets pending an adjudication by the court of the rights of the claimants. As shown in finding 23, the Commissioner of Internal Revenue, in August 1953, rejected the suggestion made by the Florida District Director that either of such actions be taken by the Government.

Therefore, we believe the plaintiff did everything in its power to alleviate the situation and beyond question the inactivity of the Government in failing to collect the rentals from plaintiff's sublessees, and its failure to proceed expeditiously, was the sole cause of plaintiff's loss which resulted from its inability to collect the rentals during the period when the tourist season was at its height.

Consequently, it is our opinion that plaintiff is equitably due the sum of $29,-425.01, which is the amount of the rentals lost by reason of defendant's inaction. Therefore, pursuant to the request contained in House Resolution 235 we recommend that Congress, in its discretion, pay this amount to plaintiff.

Plaintiff, in its petition and brief is asking for further sums representing legal fees paid, out-of-pocket expenses, interest on a loan necessitated by its inability to collect rentals, and expenses relating to repairs to the property after it eventually obtained possession. Without discussing each of these items in detail, we find that plaintiff has not established that any of these claimed expenditures was due to the acts or omissions of the defendant, and we are therefore not recommending the payment of any of these additional claims. In fact, no valid reason is proffered in plaintiff's brief as to why the Government should be required to reimburse plaintiff for these expenditures either in law or equity.

This opinion and the findings of fact, together with the conclusion thereon, will be certified to Congress pursuant to House Resolution 235, 86th Congress, 2d Session.

It is so ordered.

JONES, Chief Judge, and DAVIS, DURFEE and WHITAKER, Judges, concur.