**CUYAHOGA COUNTY, OHIO,**

v.

**UNITED STATES.**

No. Cong. 7-59.

United States Court of Claims.

Oct. 4, 1961.

Frederick W. Frey, Cleveland, Ohio, for plaintiff. John T. Corrigan, Cleveland, Ohio, was on the briefs.

Walter H. Williams, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant.

WHITAKER, Judge.

This is a congressional reference case relating to a claim for taxes assessed by Cuyahoga County, Ohio, against two parcels of land in that county, which parcels, together with eleven others, were condemned by the United States on April 22, 1942, for a housing project known as Lake Shore Village.

This claim was previously considered by this court in Brennan v. United States, 153 F.Supp. 377, 139 Ct.Cl. 433, certiorari denied 355 U.S. 890, 78 S.Ct. 263, 2 L.Ed.2d 189. We dismissed plaintiff's petition on the ground that its claim was barred by the statute of limitations. The Supreme Court denied plaintiff's petition for writ of *certiorari.* 355 U.S. 890, 78 S.Ct. 263, 2 L.Ed.2d 189.

Thereafter, H.R. 4583 was introduced in the House of Representatives and was referred to the Committee on the Judiciary. This bill provides in pertinent part as follows:

"That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $110,189.79 to the county of Cuyahoga, Ohio, in full settlement of all claims against the United States. Such sum represents taxes, interest, assessments

and penalties on parcels numbered 2 and 3 in housing project in the city of Euclid, Ohio, which were made by the authorities of the county of Cuyahoga, Ohio, and not reimbursed by the United States as agreed to by the Department of Justice: * * *"

This Bill was referred to this court by H.Res. 309, 86th Cong., 1st Sess., passed on August 31, 1959, which reads as follows:

"*Resolved*, That the bill (H.R. 4583) entitled 'A bill for the relief of the county of Cuyahoga, Ohio,' together with all accompanying papers, is hereby referred to the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and the court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant."

The question now before us is, has the plaintiff county any legal or equitable claim against the United States?

The condemnation proceedings against the property on which taxes and other charges had been assessed were instituted in the United States District Court for the Northern District of Ohio on April 22, 1942, seeking to condemn "the fee simple absolute discharged of all liens, encumbrances, charges, claims, restrictions, and covenants whatsoever." Simultaneously, defendant filed a declaration of taking and paid into the registry of the court its estimate of just compensation.

On the following day, April 23, 1942, the District Court entered a decree vesting the fee simple title in the United States. The decree was recorded in the land records of Cuyahoga County on May 4, 1942.

Defendant went into possession shortly after the filing of the declaration of taking. The housing project was completed in June 1944.

The amount originally deposited as just compensation for all the parcels condemned was $73,516, of which $21,450 was the amount deposited for parcel 2, and $13,450 was the amount deposited for parcel 3. These are the two parcels with which we are concerned in this case.

Although plaintiff was never a party to the proceedings in the District Court, defendant's attorneys, who handled the condemnation proceedings, at all times had actual knowledge of plaintiff's tax liens, and the plaintiff county had actual knowledge of the pendency of the condemnation proceedings. However, defendant's attorneys negotiated settlement agreements with the record owners of parcels 2 and 3, without consulting plaintiff.

Pursuant to the settlement agreements, final judgments were entered by the court on February 16, 1948. The judgments awarded just compensation for the two parcels at the amounts agreed upon in the settlement agreements: $30,000 for parcel 2, and $20,000 for parcel 3. Deficiency judgments were entered against the United States in the amounts of $8,550 for parcel 2, and $6,550 for parcel 3, which amounts were paid into the court.

On November 29, 1945, the court had entered an order for the payment to the city of Euclid of amounts due for special assessments for the year 1945. These amounts were $3,480.96 for parcel 2, and $1,811.30 for parcel 3. No other distribution was made until the court's order of April 8, 1948, on which date the court entered an order as to parcel 2, reading as follows:

"This cause came on to be heard upon the application of the United States of America, petitioner herein, and it being shown to the Court that the right to the full fee simple title in and to Parcel 2 is now vested of record in the United States of America;

"That by virtue of a stipulation and final judgment thereon, on file in this court, the agreed compensation for the taking of said Parcel 2 is the sum of $30,000.00 which has theretofore been deposited into the registry of this court;

"That by virtue of a previous order of distribution the sum of $3,480.96 has been distributed from said funds, leaving on deposit the sum of $26,519.04 which should now be distributed to the persons entitled thereto.

"It is, therefore, ordered, adjudged and decreed that the Clerk of this Court be and he is hereby authorized to issue a check in the sum of $26,519.04 to Ermino De-Franco, Antonio DeFranco and Mary Marino, c/o Attorneys Todia, Gordon and Sweeney, Terminal Tower Building, Cleveland, Ohio."

A similar order was issued as to parcel 3. In accordance with those orders the full balance of the money on deposit as compensation for parcels 2 and 3 was distributed to the record owners.

Plaintiff has received nothing for the taxes, penalties and assessments on parcels 2 and 3, except for the amount of $3,480.96 for special assessments on parcel 2, and $1,811.30 for special assessments on parcel 3.

Plaintiff claims it is entitled to recover $110,189.79, which it alleges is the amount of taxes, penalties, assessments and interest due on parcels 2 and 3 as of December 31, 1956, the date the United States conveyed the property to the city of Euclid, at which time it once more became subject to taxation.

The total amount of plaintiff's lien on each parcel on April 22, 1942, the date of the taking, including delinquent taxes, special assessments, penalties and interest, subsequently ascertained taxes and future installments of special assessments were as follows:

|  | Parcel 2 | Parcel 3 |
|---|---|---|
| Delinquent taxes, special assessments and penalties through 1941 | $24,105.21 | $14,428.87 |
| Interest at 8% to April 22, 1942 | 6,013.94 | 3,565.59 |
| 1942 taxes and special assessments | 1,840.00 | 1,015.39 |
| Installments of special assessments for 1943 and subsequent years | 6,063.01 | 3,152.80 |
| Totals | $38,022.16 | $22,162.65 |

Has the United States any legal obligation to plaintiff? It is clear that it has not, both because its claim is barred by the statute of limitations, and because the payment into court by the United States of the amount determined to be just compensation for the land taken completely discharged the United States of liability to everyone claiming an interest in the land. United States v. Dunnington, 146 U.S. 338, 350 et seq., 13 S.Ct. 79, 83, 36 L.Ed. 996. The case cited so completely supports the statement made, and it has been followed so uniformly by all the authorities, that we do not further discuss defendant's legal liability.

For the convenience of the Congress, we quote the following from the Supreme Court's opinion in the Dunnington case:

"2. A further question remains to be considered with regard to the proceedings taken after the payment of the money into court. It is insisted by the claimants that it was the duty of the United States, as plaintiffs in the condemnation proceedings, to take proper steps for the payment of the sum fixed by the appraisers to the persons entitled thereto, by apportioning the sum between the tenants of the life estate and the heirs of Dunnington, or by the investment of the entire amount

in interest-bearing securities, for the benefit of the tenants of the life estate, until its termination, and for the ultimate delivery of the same to the heirs. It is a necessary deduction from our conclusion upon the other branch of the case that the appraised value of the property represents the whole fee, and the interests, both present and prospective, of every person concerned in the property, and such are the authorities. Tide Water Canal Co. v. Archer, 9 G[ill] & Johns. [Md.] 479, 525; Ross v. Adams, 4 Dutcher [160], 28 N.J.Law 160. The money, when deposited becomes in law the property of the party entitled to it, and subject to the disposal of the court. In re New York Central &c. Railroad, 60 N.Y. 116; South Park Commissioners v. Todd, 112 Illinois, 379.

"It is evident that the gist of the petitioners' complaint in this connection lies in the order of the Supreme Court of the District of Columbia of April 3, 1873, directing the payment of the entire appraised value of the lot to the heirs of Martin King, the vendee of Shepherd, who had purchased the life estate of Dunnington under the confiscation proceedings. Neither Dunnington, who was still living, nor his heirs, the present claimants, appear to have intervened in the condemnation proceedings, or to have raised a question as to the propriety of this payment. The proceedings, however, appear to have been carried on in strict conformity with the act, which required the Secretary of the Interior, in case he should be unable to purchase at private sale, to apply to the court for an appraisement, and in case the owner neglected to demand of him the appraised value within fifteen days to pay the same into court, subject to being paid out to the persons entitled to it. Assuming that the payment of the entire amount to the heirs of King was a mistake, it is difficult to see how the United States can be held responsible for it. The courts of the United States are in no sense agencies of the Federal government, nor is the latter liable for their errors or mistakes; they are independent tribunals, created and supported, it is true, by the United States; but the government stands before them in no other position than that of an ordinary litigant. * * * What was the United States to do after the deposit was made, to protect itself? It had discharged its entire liability by the payment into court, and was not entitled to notice even of the order for the distribution of the money. If the Attorney General had appeared, it might have been charged that he was a mere interloper, and that only the owners of the land were interested in the distribution of its proceeds. We are not without authority upon this subject. * * * We think the United States discharged its entire duty to the owners of this property by the payment of the amount awarded by the commissioners into court, and that, if there were any error in the distribution of the same, it is not chargeable to the government."

Defendant's legal liability was to pay just compensation for the land taken. The payment of that amount into court discharged it of liability to everyone claiming an interest in the land. This, of course, included plaintiff. United States v. 25.936 Acres of Land, etc., 3 Cir., 153 F.2d 277; Washington Water Power Co. v. United States, 9 Cir., 135 F. 2d 541; Cobo v. United States, 6 Cir., 94 F.2d 351; 2 Lewis, Eminent Domain, 3d Ed., p. 1253; 1 Nichols, Eminent Domain, 2d Ed., pp. 707, 708.

■ Nor is plaintiff entitled to recover under any of the principles of equity jurisprudence. However, we have said in prior cases referred to us by Congress, to report the amount "legally or equitably due", that we understood Congress to have used the word "equitably" in the "sense of broad moral responsibil-

ity, what the Government ought to do as a matter of good conscience." B. Amusement Co. v. United States, Ct.Cl., 180 F. Supp. 386, and cases there cited. See also Burkhart v. United States, 82 F. Supp. 333, 113 Ct.Cl. 658, 667; Lamborn & Co. v. United States, 65 F.Supp. 569, 106 Ct.Cl. 703. We shall now consider the matter from this standpoint.

■ Ordinarily the Government is not legally responsible for the negligence of its officers and agents. This is based on sound principles of public policy. Its broad moral responsibility therefor, if any, in this case rests on the negligence of its attorney in preparing for the signature of the District Judge, before whom the condemnation proceedings were pending, an order directing the payment of the balance of the money deposited by the United States, as just compensation for the property taken, to the record owners of the property, without first having satisfied the claim of plaintiff for taxes and special assessments against the property.

The County was not made a party to the condemnation proceedings, but it had full knowledge of them. Notwithstanding this knowledge, the County's attorneys took no action to protect its interests, except to write letters to Mr. O'Neil, the Special Assistant United States Attorney, inquiring about the progress of the proceedings, and some telephone calls and personal conversations with him.

On December 6, 1944, an assistant prosecuting attorney for the County wrote Mr. O'Neil wanting to know "What arrangements, if any, have been made to pay the County Treasurer the amount due him for taxes." He also asked for a conference at Mr. O'Neil's convenience. About a year later the same assistant prosecuting attorney wrote Mr. O'Neil as follows:

"Referring to our letter of December 6, 1944, and our subsequent telephone conversations relative to the payment of taxes due on the premises in caption, can you now advise us when these taxes will be paid?

We understand that $21,450.00 have been deposited in Federal Court and from this amount the taxes were to be paid. Our most recent telephone conversation was October 22, 1945, at which time you informed the writer that you would check your files and advise this office.

"Your co-operation in this matter will be greatly appreciated."

In reply, Mr. O'Neil wrote him offering to make a partial payment, since, he said, the amount on deposit in the court was insufficient to pay the taxes in full. (Plaintiff's exhibit 4.) In reply the County's attorney asked that payment be made to the County Treasurer. He was referred to a Mr. Edwards as to how the payment should be applied.

Mr. O'Neil did not reply to this letter until after the County's attorneys had written him several times. Finally, on February 18, 1946, he replied as follows:

"At the present time no adjustment of delinquent taxes on the above property has been made. This tract of land is on the trial list for cases to be held in March of this year, and at that time a jury verdict will decide what the amount of just compensation is.

"Since the settlement of this case will take place at a fairly early date, we believe the best thing to do is to wait until we know the jury verdict before attempting to make any adjustment of taxes. The amount which is on deposit in court now is not enough to pay all the delinquent taxes and it may be that the jury verdict will be in an amount which will completely cover all taxes."

In response to a later inquiry of the County's attorneys, Mr. O'Neil wrote that the case had been postponed, but "As soon as any developments are had in this case which will enable us to pay the taxes, you will be advised."

Prior to the distribution of the money on deposit the County attorneys wrote Mr. O'Neil two other letters inquiring about the status of the matter, but the

record does not show what reply, if any, was made. After the distribution, in apparent ignorance thereof, the County's attorneys continued to write Mr. O'Neil until May 1, 1950, asking for payment. Finally, on May 9, 1950, Mr. O'Neil wrote the County's attorney in part as follows:

"I have written the Public Housing Administration and the Cleveland Metropolitan Housing Authority to find out if they will not assist in clearing up this tax deficiency.

"While the record shows service, there was no answer on behalf of the County setting up this tax lien, although there were letters setting out the amount which were not apparently compared in computing the whole amount due. This office did remit $37,000.00 in taxes, in six orders, copies of which are enclosed. Stipulations as to settlement were signed with the property owners and their counsel, Messrs. Todia, Sweeny & Gordon, and other law firms representing the parties.

"This office must admit the error of presuming that these orders covered all the taxes due before disbursement was made. I do not believe recovery of the amount so disbursed to these owners can be easily made and further the whole amount disbursed still leaves a large deficiency.

*  *  *  *  *  *

"I regret that this tax deficiency has been of such long standing but we will use every effort to see if we cannot soon meet the principal amount due."

Parcels 2 and 3, involved in this case, were a part of the 13 parcels of land condemned for a housing project in the city of Euclid. All were condemned in one action. All taxes, penalties and special assessments on all parcels, except 2, 3 and 5, were paid out of the money deposited by the United States with the Clerk of the court. For some reason, for which there is no satisfactory explanation, they were not paid on parcels 2, 3 and 5. The money on deposit for these parcels was paid to the record owners of the property. Later, however, the record owner of parcel 5 paid the taxes due thereon. Except for the special assessments of $3,480.96 and $1,811.30, none of the taxes or other charges on parcels 2 and 3 have been paid.

As stated heretofore, the money was paid out on order of the court. However, the Special Assistant United States Attorney drew the order of disbursement and presented it to the District Judge for signature. The Special Assistant United States Attorney's name appears on the order under the word "Approved". Only he formally approved it. It was not approved by attorneys for the county.

About a month after the distribution, the Chief Deputy County Treasurer learned of the distribution and he informed Mr. Edwards, the Chief Assistant Prosecuting Attorney thereof, but apparently Mr. Edwards did not pass this information on to his subordinates who were supposed to be handling the matter, because there were put in evidence six letters from them to the Special Assistant United States Attorney asking that the money on deposit in the United States District Court be paid to the County. There was no money on deposit in the court when these letters were written.

The county's attorneys were lacking in diligence. Prudence required that they intervene in the condemnation proceedings and protect the county's interests, especially after they had been advised that the money on deposit was not sufficient to pay all taxes and other charges due. At no time did they ever go to the District Court and examine the records in the case. Instead, they relied on writing letters and on telephone calls, and perhaps some conversation with the Special Assistant United States Attorney. Had they properly protected the county's interests, the money deposited by the United States would have, of necessity, been paid to the county.

On the other hand, the Special Assistant to the United States Attorney should

have made the county a party to the proceedings in the first instance, and especially after he learned that the county's claim exceeded the amount on deposit. He should have consulted the county before agreeing on a valuation of the property. And, above all, he should have secured the approval of the county to the proposed order of distribution. How he could have failed to do so, with full knowledge of the claims of the county, "passeth understanding".

Both the lawyers for the county and the lawyers for the United States were negligent. Of course, it was not the legal duty of the Special Assistant United States Attorney to protect the interests of the county, but he knew its attorneys were relying on his assurances that he would, and honorable and fair dealing required him to do so. How he could have forgotten about the county's claim, we do not see.

■ Applying the broad principles of moral responsibility, in which sense we use the word "equitable", and considering the lack of diligence of the attorneys on both sides, we think the equitable solution of this matter would be for the United States to pay to the county one-half of the $44,707.74 disbursed to the record owners.

This opinion, together with the findings of fact which follow, will be certified by the clerk to the Congress pursuant to H.Res. 309, 86th Congress, 1st Session.

It is so ordered.

MADDEN, Judge (Retired), and DURFEE and LARAMORE, Judges, concur.

JONES, Chief Judge (concurring in part).

I would recommend that the plaintiff be paid the amount of the taxes up to April 22, 1942, the date when the defendant requisitioned the property, limited to the amount which was distributed to the wrong parties. In other words, I feel that plaintiff on the basis of equity should be paid $44,707.74 rather than half that amount as recommended by the majority.

The tax liens were fixed and of record when the Government requisitioned the property. Neither the county nor its officials were made a party to the requisition proceedings. The taxes were a first lien and constituted a direct interest in the property. These taxes have not been paid on the parcels in question.

It is true some of the county officials knew that the proceedings were pending. It is also true that the defendant's officials knew and also had official record notice of the first lien taxes.

There is considerable conflict in the testimony as to how much conversation occurred, as to what promises were made, and as to whether assurances were given that the county's rights would be protected in final distribution.

All this points up the wisdom of having matters affecting land reduced to writing. Since the Statute of Frauds was enacted in England in 1677, practically every civilized country has enacted laws which provide that not a spoonful of dirt may be transferred in ownership from one party to another except in writing. Otherwise there could be no quieting of title in anyone so long as human beings possess an imagination, defective memories, and a degree of cupidity.

Since the issues are the same, in so far as the equities are concerned, I repeat a portion of what I said when the case was before us on the original trial.

"To deny [full] recovery in this case is unthinkable. Such action would directly violate the Fifth Amendment in two respects. It would deprive plaintiff of property without due process of law, and it would involve the taking of private property without just compensation.

"That can't be done against an individual, much less against a State.

"The defendant admits that neither the State, county, nor any of their officers or agents were made parties to the proceeding. How can they be bound?

"The defendant says that some of the State or county officers knew about the

proceeding. Are we to have citation by rumor or by the uncertain word of the village gossip? There are some of the forms of procedure that are vital and cannot be supplied by the conflicts and uncertainties of oral testimony.

"These taxes were a first lien on the land. As was stated in Monroe v. Doe, 7 Ohio 262, 265:

"'* * * The state has a lien upon all land not exempt from taxation, which is calculated to be perpetual and which cannot be affected by any sale or transfer * * *. It can be removed in no other way than by payment of all taxes, penalties and interest due on the land.'

"In volume 24 of the original edition of Ohio Jurisprudence, at p. 100, is found the following language:

"'It is a fundamental proposition that persons having rights in land cannot be affected by a judgment or decree taking such land unless they are parties to the proceedings. [Citing Meyers [Myers] Fall & Collins, et al. v. Hewitt, 16 Ohio 449.]'

"As in practically all States, a tax lien is a first lien and is superior to all other liens.

"We quote from 2 Lewis Eminent Domain § 524 (3d Ed., 1909):

"'In Nebraska it has been held that a tax lien in favor of the State was not divested by a condemnation for railroad purposes * * * lien holders are *owners* within the statute and * * * must be made parties and * * * to divest their interest. [Citing State v. Mo. Pac. Ry. Co., 75 Neb. 4, 105 N.W. 983.] * * * In any case the lien would undoubtedly follow the fund and could be enforced against the fund * * *.' [Citing In re Sleeper, 62 N.J.Eq. 67, 49 A. 549.]

"We quote from section 538 of the same authority:

"'If a necessary party is omitted, the proceedings will be nugatory as to such party. But as a general rule such an omission does not vitiate the proceedings as to those who are parties, nor can the latter complain of such omission.' [Citing cases.]

"The author then states the general principles gleaned from a review of a great many eminent domain cases. These include, *inter alia*, that the Fifth Amendment should be liberally construed for the protection of private rights; that the word property includes every valuable interest which a person can have in or appurtenant to land; and that due process of law requires that the owner of any such right or interest should have a reasonable opportunity to be heard on the question of compensation before he can be deprived thereof for public use.

"It has been held that payment to one other than the person entitled thereto is not a defense. Palo v. Rogers, 1933, 116 Conn. 601, 165 A. 803.

"The courts have uniformly held that where property is subject to a tax lien, the payment of compensation money into the registry of the court does not extinguish the tax lien, but the lien is merely transferred from the land to the fund. Board of Capitol Managers v. Brasie, 1922, 72 Colo. 153, 210 P. 63; Ross v. Kendall, 1904, 183 Mo. 338, 81 S.W. 1107; Carpenter v. City of New York, 1899, 44 App.Div. 230, 60 N.Y.S. 633.

"We quote from the Brasie case, supra [72 Colo. 153, 210 P. 64] the following:

"'The money in the registry of the court stood in the place of the land, and the court below fell into error in not so holding. So much of the funds in the hands of the clerk as may be necessary should be applied to the payment of the special improvement tax, with accrued interest thereon, and the remainder, if any, should be paid to the respondent.'

"'* * * A. F. O'Neil, Special Assistant United States Attorney, testified that he had paid millions of dollars to the county authorities, on other parcels of land and in other cases, and in no case was the county made a formal defendant. This procedure, therefore, was the cus-

tomary and established way of handling such matters between county and Federal authorities. The tax lien, being a first lien, always followed the proceeds and became a lien on any fund that might be paid into court by way of compensation.

"Witnesses on both sides in this case testified that in this particular county it often happens in Federal and State condemnation cases that the county is not made a party defendant, * * *.

\* \* \* \* \* \*

"The first overt act by the Government which gave any indication that the Federal Government intended to refuse to recognize the validity of the tax liens was when the orders of distribution were entered on April 8, 1948. Prior to that date the county had been repeatedly assured by letter of the Special Assistant United States Attorney in charge of the condemnation proceedings, Mr. O'Neil, that the taxes would be paid out of any funds arising out of a jury or court verdict entered on final trial and disposition of the case. The funds were distributed without regard to the valid existing tax liens, and without provision for their payment. Again the county officials were not notified and the rights of the plaintiff were completely ignored. 'Upon what meat doth this our Caesar feed, that he is grown so great' as to be able to ignore the established rights of a subdivision of a sovereign state? One is reminded of the story of the cannibal who is said to have claimed title to a piece of land on the ground that he ate the owner.

\* \* \* \* \* \*

"The money was paid out to the former owners under an ambiguous agreement that apparently led such owners to believe that they were being paid these amounts for their equity. At the time these ambiguous agreements were made the Federal officials were fully aware of the fact that the sums that they were agreeing upon and paying were insufficient to cover the tax liens. In spite of all this, the money was paid out without a word being said to the plaintiff, who held a first lien on the fund. Whatever else may be justified, the defendant would be liable for such of the valid unpaid taxes that were in effect at the time the declaration of taking of the land was first made, to the extent at least that the funds unjustly distributed would have been sufficient to absorb such taxes.

"The facts shine through this whole record that the Federal officials apparently feared to let the rate of compensation as to this suburban property be fixed at a regular trial and deliberately settled with the equity owners for the purpose of leaving the plaintiff without any enforceable rights." [153 F.Supp. 378.]

Stripped of its excess baggage and verbal persiflage, the bald facts remain—standing apart and shining like a cathedral—that the Government took the property upon which an official unit of a sovereign state had a valid lien; that the county was not made a party to the suit; that the funds were paid out by Federal officials on orders approved by the United States District Court, and that the first lien was bypassed and the county left holding the bag.

The majority opinion quotes extensively from the case of United States v. Dunnington, 146 U.S. 338, 13 S.Ct. 79, 80, 36 L.Ed. 996.

A careful reading of that case shows that it is utterly inapplicable to the facts here presented. If the time ever comes when it properly applies it should of course be given due consideration, but in its essence it has no more relevancy to the issues presented here than has Homer T. Wilson's lecture on "America's Uncrowned Queen." The Dunnington case was "a proceeding by the heirs at law of a person formerly in rebellion against the United States to recover the value of a lot of land, which had first been confiscated as enemy's property, and then condemned, in the hands of the purchaser, for the use of the government and for the enlargement of the Capitol grounds. * * * Under the confiscation act of July 17, 1862, 12 Stat. 589, c. 195, the lot had been seized as the property of a public enemy and sold to Shepherd."

In 1872, the Congress passed a special act which authorized the Secretary of the Interior to make a purchase of additional property for the Capitol grounds and to ask the "Supreme Court of the District of Columbia" under such rules as it may adopt to make a just and equitable appraisement of the several interests of each and every owner of real estate, etc.

The act was a special one having to do largely with the right of heirs in property that was confiscated from owners some of whom had been classed as "enemy aliens."

That entire case grew out of one of the most tragic experiences in our Nation's history and was governed by special acts.

The final decision from which the majority opinion quotes was not written until 1892, 30 years after the property was confiscated.

The Supreme Court held that "the presumption is, that due and legal notice was given of the proceedings, the appraisement was valid and binding upon Dunnington and his heirs." 146 U.S. at page 350, 13 S.Ct. at page 83. Clearly the decision had no application to the case at bar.

By every tenet of fair play that I have known or read about from my youth to this good hour, Cuyahoga County should be reimbursed to the extent of $44,707.-74, and I so recommend.