**NEBCO & ASSOCIATES a Nebraska Partnership, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 90–343C.

United States Claims Court.

July 26, 1991.

Frank Meares, Omaha, Neb., for plaintiff.

Kathleen N. Coleman, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge.

This case is before the court on the parties' cross-motions for summary judgment. For the reasons stated below, the court grants defendant's cross-motion, and denies plaintiff's motion.

## FACTS

Plaintiff, Nebco & Associates, is a Nebraska partnership that buys, sells, and rents real estate. Nebco was interested in purchasing a restaurant known as Marchios' Italian Cafe from the United States, acting through the Small Business Association (SBA). SBA, among other things, guarantees small business loans made by commercial banks. SBA obtained the property after its previous owner defaulted upon a loan which SBA had guaranteed.

Marchios' Italian Cafe had been a successful restaurant which Paul and Pauline Marchio operated until they retired. In 1976, the Marchio's sold the property by warranty deed to Bianco Broome Corporation (BBC), and took back a mortgage. Upon delivery of the deed, BBC executed a security agreement wherein the Marchios became secured creditors.

In 1980, BBC sought a loan, secured by the Marchio property, from the First National Bank of Bellevue (FNB), which the bank sought to guarantee through SBA. SBA approved the loan subject to FNB obtaining a subordination agreement from the Marchios.[1] On January 2, 1981, the Marchios subordinated their mortgage from BBC to that held by FNB. FNB then filed the subordination agreement with the Office of the Register of Deeds, Douglas County, Nebraska. On that same day, Frank and Cheryl Bianco, and Arlan and Rose Marie Broome executed a personal guaranty for the promissory note held by the Marchios. BBC executed a note in favor of FNB for $190,000, which it later amended, increasing the principle amount to $230,000. BBC then executed a mortgage in favor of FNB for $230,000, which FNB also recorded.

BBC subsequently defaulted on its mortgage to FNB. Following default, FNB assigned all "right, title, and interest" in the subordination agreement, notes, and mortgage to SBA. SBA recorded the assignment of the subordination agreement and mortgage on February 18, 1983. In April 1983, BBC executed and filed an amendment to its Articles of Incorporation changing its name to R.R.A., Inc.

On May 11, 1983, R.R.A. executed a Corporation Quit Claim Deed releasing its interest in Marchios' Italian Cafe to SBA "in lieu of foreclosure." The quit claim expressly stated that it was the "intent" of the parties that "accepting and/or recording of this deed shall not in any manner extinguish, merge or cancel" the mortgages that FNB had assigned to SBA, and that the "mortgage liens shall remain in full force and effect until expressly and specifically released of record by [SBA]." SBA executed an affidavit as to non-merger of lien, and recorded the quit claim and affidavit in June 1986.

---

1. Upon default by a mortgagor, monies available to mortgage holders after foreclosure and sale of the property are distributed according to priority. Priority generally is based upon the time that a lien or mortgage is recorded. However, most banks will not loan money on property unless their mortgage is senior to all other liens. A subordination agreement would make the interest of a "first in time" lienor, the Marchios, junior to that of SBA. *See* 55 Am. Jur.2d *Mortgages* §§ 323, 344 (1971 & Supp. 1991); 59 C.J.S. *Mortgages* § 218 (1949 & Supp. 1991).

In December 1986, SBA initiated a suit in the United States District Court for the District of Nebraska against Paul and Pauline Marchio seeking a decree that "all right, title, and interest of the [Marchios] in the property be foreclosed." Frank and Cheryl Bianco filed as intervenors in the suit alleging that the Marchios' mortgage was superior to the interest of SBA, and that, by accepting R.R.A.'s quit claim deed, SBA waived and released any rights it held under the mortgage. On June 29, 1988, the district court issued a judgment and decree of foreclosure, and order of sale. The court found that SBA held a first mortgage lien on Marchios' Italian Cafe, and that Pauline Marchio held a second lien on the property.[2] The order of sale required that the real estate be sold at auction if not redeemed within 20 days.

On July 29, 1988, SBA filed an "Application for Order of Sale" with the district court, which the court subsequently issued. SBA advertised the auction according to procedure, and, on October 26, 1988, the U.S. Marshall sold the property and equipment to the highest bidder, SBA, for a total of $250,000. Immediately thereafter, an independent auction company hired by SBA auctioned the property and equipment. Plaintiff, the highest bidder, purchased the property and equipment for $241,000. On that same day, plaintiff and SBA executed a purchase agreement. Plaintiff made a deposit of $24,100, with the remaining $216,900 due on or before December 22, 1988.

The purchase agreement was a form contract, provided by SBA, with information specific to the particular sale handwritten in ink. The purchase was subject to, and conditioned upon, SBA having "good title in fee simple," and agreeing to convey the property by "good and sufficient quit claim deed." The agreement also provided that SBA would furnish an attorney's title opinion or title insurance to plaintiff. Within 10 days thereafter, plaintiff was to provide SBA with a "written legal opinion" show-ing any defects in title. SBA then would have a "reasonable period of time" to cure any title defects. The contract also contained a liquidated damages clause granting SBA the option of retaining the deposit if plaintiff failed to consummate the purchase.

The district court confirmed the purchase of the property by SBA, and the U.S. Marshall delivered the deed to the property to SBA on November 21, 1988. SBA recorded the deed on December 1, 1988, and delivered a commitment for title insurance to plaintiff eight days later, indicating that title in fee simple was vested in the Administrator of the Small Business Administration. The commitment contained various exceptions to coverage which SBA subsequently cured. On January 16, 1989, plaintiff's attorney wrote a letter to SBA indicating his conclusion that SBA could not "convey good and marketable title to plaintiff," and requested a return of the "earnest deposit." SBA did not consider this letter a legal opinion, as required by the contract, as it was "conclusory and did not specifically identify the alleged problems." SBA indicated this to plaintiff, and offered to extend the closing date, but cautioned that SBA would exercise its contractual right to retain the deposit as liquidated damages if plaintiff failed to consummate the purchase.

On January 30, and February 8, 1989, plaintiff sent letters to SBA again indicating its position that SBA could not "convey good title." These letters included various assertions of clouds upon the title. For the purpose of this order, the court will discuss only the alleged clouds pleaded in plaintiff's complaint and motion for summary judgment. Among these were assertions that the foreclosure sale, which vested title in SBA, failed to join as necessary parties to the proceeding: BBC or R.R.A., alleged mortgagors of the property; Arlan and Rose Marie Broome, shareholders of R.R.A.; FNB, alleged claimant upon the property; and Vacanti & Randazzo Construction Company (Vacanti), alleged judg-

---

2. Paul Marchio died during the foreclosure action and Pauline Marchio was substituted as personal representative of his estate.

ment creditor upon the property. Plaintiff's second letter also demanded that SBA provide plaintiff with documents indicating satisfaction of the alleged Vacanti judgment lien; warranty deeds from R.R.A., BBC, and Arlan and Rose Marie Broome to SBA; and proof of the name change and an assumption of the debts of BBC by R.R.A.

In letters dated February 6, and February 22, 1989, SBA responded to plaintiff's letters stating that the January 30 letter was its first notice from plaintiff, by written opinion, of any defects in the title, and that plaintiff should consider SBA's letter as evidence that SBA would cure these "title defects within a reasonable period of time." SBA provided plaintiff with explanations why each of the above parties was not necessary to the foreclosure action as plaintiff contended, and enclosed photocopies of the documents which abrogated all of the exceptions to the title insurance commitment except for an $87.00 assessment for weed cutting. In its letter, SBA indicated that it would satisfy all conditions prior to closing. SBA further stated that if title insurance were issued to plaintiff as agreed, the insurance would protect plaintiff statutorily "against loss or damage suffered by reason of liens, encumbrances upon, defects in or the unmarketability of title to [the] property, or adverse claim to title in [the] property." NEB.REV.STAT. § 44–1901(1)(a) (1990). SBA maintained that there were no defects in the title which it had not cured, or insured against. The letter demanded that the transaction be closed, and reiterated that if plaintiff failed to consummate the purchase, SBA would retain the deposit as liquidated damages.

Plaintiff affirmed its belief that SBA could not give "good title in fee simple," and again asked for recovery of its deposit stating that the contract did not "require the purchaser to accept a title company write over of obvious deficiencies in the title." On March 13, 1989, SBA received an updated title insurance policy showing as cured all liens and encumbrances against the real estate, with the exception of the $87.00 special assessment for weed cutting.[3] On March 22, 1989, SBA wrote a letter to plaintiff giving "notice of rescission of contract." The letter went on to confirm that SBA intended to retain the money paid by plaintiff "as liquidated damages pursuant to the language of the purchase agreement signed by plaintiff."

Plaintiff contended that this "notice of rescission" acted to nullify the contract and, therefore, damages would not be appropriate. SBA maintained that the wording of this letter, along with previous letters, clearly indicated that SBA did not intend to nullify, but rather affirmed the contract by claiming plaintiff's deposit as liquidated damages. In the alternative, plaintiff claimed that damages are not appropriate because the alleged clouds on the title made SBA's performance of the contract impossible. Plaintiff also argued that the contract was one of adhesion, and that the retained damages constituted forfeiture.[4]

## DISCUSSION

 Summary judgment is appropriate when there are no genuine issues of material fact in dispute so that the moving party is entitled to judgment as a matter of law.[5]

3. SBA has since paid this assessment.

4. Although somewhat unclear exactly what plaintiff meant by "forfeiture" in its complaint, the court, and defendant, assumed that plaintiff believed the liquidated damages clause in the contract operated as a penalty rather than a reasonable estimate of damages.

5. In its statement of genuine issues, plaintiff pointed to several "questions of fact" it believed had not been resolved. Plaintiff obviously was confused about what constitutes a "genuine issue for trial." An issue is not "genuine" unless it could lead a rational trier of fact to find for

the non-moving party. The court finds plaintiff's assertions frivolous at best.

Plaintiff asserted that Joseph Breci, a partner of Nebco & Associates (Nebco), signed the purchase agreement, not Nebco. However, any logical reading of the agreement indicates that Breci signed on behalf of Nebco. Nebco, as a non-human, legal entity, could not sign an agreement. Because plaintiff did not allege that Breci lacked authority to sign on behalf of the partnership, this "fact question" is ludicrous.

Plaintiff contended that the purchase agreement did not require payment of $216,900 on or about December 22, 1988. Plaintiff is wrong.

RUSCC 56(c). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Housing Corp. of Am. v. United States*, 199 Ct.Cl. 705, 468 F.2d 922, 924 (1972); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). When the moving party has carried its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). "[When] the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

■ Federal law governs contract transactions involving the United States, *See, e.g., Fansteel Metallurgical Corp. v. United States*, 145 Ct.Cl. 496, 172 F.Supp. 268 (1959); *United States v. Allegheny County*, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944). However, mortgage issues are governed in the main by state law. *See United States v. Scholnick*, 606 F.2d 160, 164 (6th Cir.1979). Where there is no federal law on point, a court may adopt state law or fashion the governing rule of law, whichever best serves the interests of justice. *Id.* at 164.

The second paragraph of the agreement specifically states: "[Nebco] agree[s] to pay ... two-hundred-sixteen-thousand nine-hundred due on or before Dec. 22, 1988." Either Nebco did not read the contract, or believed the court would not read it. Clearly, this is not a question of fact.

Plaintiff pointed to a document which showed two names, other than the Biancos and the Broomes, appearing as incorporators on Bianco Broome Corporation's (BBC) incorporation documents. However, plaintiff did not explain what significance this might have to the disposition of the case. Because plaintiff did not allege that the Biancos and the Broomes acted without authority to bind the corporation, it is immaterial whose names appear on the incorporation documents.

Plaintiff asserted that the security agreement between the Marchios and BBC "shows no collateral such as personal or real property." Once again, plaintiff is wrong. The second and third paragraphs of the agreement clearly show collateral. Apparently, plaintiff has not read the security agreement.

Plaintiff believed that the district court did not order a judgment and decree of foreclosure, and order of sale, but merely signed a stipulated agreement prepared by the Small Business Administration (SBA). This unsupported assertion is completely irrelevant to the disposition of the case. The district court issued the decree and order, and all parties to the suit signed and approved the decree.

In its proposed findings of uncontroverted fact, defendant pointed to a loan application Nebraska National Bank (NNB) forwarded to SBA on December 9, 1988, for a business loan to Brecis, Inc., owned by the partners of Nebco. The collateral "Brecis" offered for the loan was the disputed property, and NNB gave SBA Nebco's financial statements to process the loan application. SBA did not approve the loan.

The court assumes defendant added this information to imply that plaintiff, by exercising an act of ownership over the property (i.e., offering the contested property as collateral), had terminated its power of avoidance, thus making rescission, as claimed by plaintiff, impossible. *See* Restatement (Second) of Contracts § 380(1)(2) (1981). Plaintiff contended that there was a factual question regarding whether a corporation named Brecis, Inc. ever existed. By doing so, plaintiff did not allege that it had not requested a loan from NNB using the disputed property as collateral, but that it used an imaginary corporation name on the application. The court cannot imagine what plaintiff hoped to gain by pointing out its potentially fraudulent loan application. That information, which is immaterial to the issues currently before the court, cannot preclude summary judgment.

Plaintiff contended that the auctioneer pointed out defects in title to the property at the auction, and that SBA was aware of those defects. However, any alleged defects existing at the time of the auction are immaterial. SBA need only have had "title in fee simple" by the closing date. *See, e.g., Gittleman v. Fesenmaier*, 268 Minn. 238, 239–40, 128 N.W.2d 709, 710 (1964).

Finally, plaintiff asserted that its January 16, 1989 letter to SBA constituted a "written legal opinion." Defendant claimed that failure to provide *any opinion within ten days*, as required by the agreement, constituted a waiver of plaintiff's right to assert title defects. Nebco has failed to provide the court with any evidence that its failure to provide an opinion within the time allowed by the contract should not be deemed a waiver of its right to complain of defects to the title. However, because the court finds that none of plaintiff's alleged defects in title have merit, the court need not address this issue.

## A. The Parties Did Not Reach An "Agreement Of Rescission."

Plaintiff maintained in its brief that both plaintiff and SBA declared rescission, thereby placing the parties in the position which existed before the creation of the "rescinded" contract. Unnecessary confusion as to the meaning, use, and application of the term "rescission" has muddled the critical issue of right to damages.

When each party agrees to discharge all of the other party's duties of performance there is an "agreement of rescission." *See* RESTATEMENT (SECOND) OF CONTRACTS § 283 comment a (1981). This should not be confused with the word "rescission," which sometimes is used to refer to a power of avoidance a party may exercise when there is fraud or mutual mistake. *Id.* Plaintiff, somewhat inartfully, apparently claimed an "agreement of rescission" by SBA. SBA, on the other hand, claimed cancellation, which occurs when either party ends the contract for breach by the other. However, this distinction is not dispositive as either approach, applied to the facts in this case, provides the same result as to damages.

Rescission by abandonment requires the mutual assent of both parties. *Armour & Co. v. Celic,* 294 F.2d 432, 435 (2d Cir.1961) (citations omitted); RESTATEMENT (SECOND) OF CONTRACTS § 283(1). Assent may be shown either by written agreement, or by other conduct which indicates an intent by both parties to abandon the contract. RESTATEMENT (SECOND) OF CONTRACTS § 283 comment a. When there is no written contract, an intent to abandon may be ascertained from the facts and circumstances involved. *Montana Bank of Circle v. United States,* 7 Cl.Ct. 601, 610 (1985). "[T]he acts of the parties must be positive, unequivocal and inconsistent with an intent to be further bound by the contract." *Armour,* 294 F.2d at 436 (citations omitted).

When determining if rescission took place, "courts look not only to the language of the parties, but to all circumstances." *Lustgarten v. Jones,* 220 Neb. 585, 591,

371 N.W.2d 668, 672 (1985). In *First National Bank of Aberdeen v. Indian Industries,* 600 F.2d 702, 708 (8th Cir.1979), the eighth circuit gave credence to a finding by the district court that a party may not intend rescission despite the use of the term in a letter. " '[W]hether a contract is spoken of as terminated, abrogated, annulled, avoided, discharged, or rescinded is not in itself important.' " *Id.* (quoting *Illeges v. Congdon,* 248 Wis. 85, 21 N.W.2d 647 (1946)). Rather, "[a]n actual intent to abandon must exist." *Montana,* 7 Cl.Ct. 601, 610 (1985). SBA's affirmance of its right to damages in its "rescission" letter clearly indicated its intent that plaintiff be further bound by the contract, and, therefore, negated any "positive or unequivocal" agreement to rescind.

Even where a court finds mutual rescission of a contract, entitlement to the return of a down payment depends upon whether the parties agreed that the down payment would be returned. *See Billings v. Gardner,* 88 Or.App. 370, 372–73, 745 P.2d 792, 793 (1987); RESTATEMENT (SECOND) OF CONTRACTS § 283(2) comment c, illustration 3. SBA consistently affirmed its right to liquidated damages in all correspondence with plaintiff—including its "notice of rescission." Were the court to conclude that SBA had agreed to rescind, it could not conclude thereby that SBA also intended to return the down payment. Accordingly, plaintiff failed to show that there is a genuine issue for trial with regard to whether SBA rescinded the purchase agreement and waived its right to liquidated damages.

## B. SBA Had Good and Marketable Title.

Plaintiff alleged that SBA did not own the property at "material times." It is unclear from plaintiff's brief whether it actually believed that SBA did not hold *legal* title to the property, or whether it merely believed that various alleged clouds upon the title made it impossible for SBA to convey *"good* title in fee simple." If, in fact, plaintiff could prove that SBA could not convey good title within the time required for performance, the court could declare the contract rescinded for mutual

mistake of a material fact, and plaintiff would be entitled to a return of its deposit plus interest. *See Boris v. Heyd,* 220 Neb. 569, 570–71, 371 N.W.2d 268, 269–70 (1985). Plaintiff apparently believed that the foreclosure action in the district court was invalid because the Marchios and SBA "did not have a mortgagor-mortgagee relationship," and "SBA could not foreclose on a mortgage on which they were not the mortgagee." Plaintiff's erroneous conclusion indicates a naked misunderstanding of the purpose of foreclosure proceedings.

■ A foreclosure proceeding determines "the existence, extent and priority of a mortgage lien and [orders] the sale of the real property pledged to secure its satisfaction." *United States v. Scholnick,* 606 F.2d 160, 165 (6th Cir.1979) (citation omitted). Junior mortgagees are made parties to foreclosure proceedings in order to "determine [their] legal rights in the mortgaged property, to bind [them] to the decree of the court, and to cut off [their] equity of redemption."[6] *Id.; accord* 55 AM.JUR.2D *Mortgages* § 572 (1971). The Marchios were joined as defendants in the proceeding to determine the priority of their lien and to extinguish their right, title, and interest in the property—not because they had defaulted on a mortgage held by SBA. The Marchios, properly joined, represented, and adjudged, have no further rights in the property.

■ Plaintiff also apparently believed that SBA's failure to join BBC/R.R.A., the Broomes, Vacanti, and FNB to the foreclosure action did not foreclose their interests in the property, creating potential clouds. It is true that persons possessing rights in real estate cannot be affected by a judgment or decree which extinguishes those rights unless they are parties to the proceedings. *See, e.g., Cuyahoga County, Ohio v. United States,* 155 Ct.Cl. 307, 294 F.2d 775, 782 (1961). However, plaintiff's tortured brief and fact summary offered no explanation, argument, or persuasive reason why any of the above mentioned parties had any rights or interest in the property. The court will address plaintiff's contentions with respect to each party in turn.

■ Plaintiff baldly asserted that because SBA joined neither R.R.A. nor BBC (the alleged mortgagors of the mortgage being foreclosed), it could not maintain a foreclosure action. Plaintiff is incorrect. A mortgagor who has conveyed all rights and interests in the mortgaged property is not a necessary party unless a deficiency decree is sought by the mortgagee. *See Federal Deposit Ins. Corp. v. Huntington Towers, Ltd.,* 443 F.Supp. 316, 320 (E.D.N.Y.1977). None was sought here. When R.R.A. (the same entity as BBC) deeded the property to SBA in lieu of foreclosure, it conveyed all rights to title to SBA, and no longer had any interest in the property.

■ Alternatively, plaintiff asserted that, if SBA claimed title from R.R.A., the foreclosure was either unnecessary or improper. As to its first contention, the need to foreclose upon the Marchio lien was obvious. Because R.R.A. had deeded the property to SBA, SBA was free to sell it as it wished; however, the Marchios' lien would have remained a cloud on the title. The foreclosure action was necessary to determine priority, and to extinguish any right, title, or interest the Marchios had in the property.

■ Plaintiff's second contention, that foreclosure was improper, was based on plaintiff's groundless and irresponsible assertion that acceptance of R.R.A.'s quit claim deed constituted merger. When a mortgagee acquires title to real estate upon which it holds the mortgage, unless a contrary intent is expressed in the deed conveying title, a court might conclude that the mortgage merged with the title. If merger is found, the mortgage is extinguished and foreclosure is impossible. *See* NEB.REV.STAT. §§ 76–274–275 (1990). But, even when a contrary intent is not expressed, courts do not always find merger.

---

**6.** Equity of redemption allows a junior mortgagee to discharge the indebtedness of the debtor, after default, but prior to foreclosure, so that the junior mortgagee maintains its rights in the property. See *United States v. Scholnick,* 606 F.2d 160, 165 n. 3 (6th Cir.1979).

*Waite Lumber Co. v. Masid Bros., Inc.,* 189 Neb. 10, 14, 200 N.W.2d 119, 122 (1972). Generally, whether a merger results or not depends upon the intention of the mortgagee. If no intention appears, courts will presume a result which best preserves the mortgagee's interests. *United States v. Joe Murray's Point Lookout, Inc.,* 342 F.Supp. 92, 95 (S.D.N.Y.1972); 55 AM.JUR.2D *Mortgages* §§ 1258, 1404 (1971). Here, SBA specifically expressed its intent as to non-merger in the deed, and affidavits filed with the deed, so that it could maintain a foreclosure action on the property to protect its interest. In such a case, the court could not find merger under any circumstance. *See, e.g.,* 55 AM.JUR.2D *Mortgages* §§ 1258–59; *Waite Lumber,* 189 Neb. at 14–15, 200 N.W.2d at 122–23.

■ SBA did not join the Broomes in the foreclosure action because they did not have an actual interest in the real estate. The only connection the Broomes ever had to the matter was that they, along with the Biancos, *personally* guaranteed BBC's promissory note to the Marchios. That contract was between the Broomes, the Biancos, and the Marchios, and entirely distinct from the real property at issue. The Broomes might have been allowed to intervene as proper parties because of their interest in the subject matter of the action, *i.e.,* to protect their individual interest as guarantors of the note to the Marchios. However, because the foreclosed mortgage was upon property in which the Broomes had no actual interest, they could not have been a necessary party. *See, e.g., Liberty Nat'l Bank of Dickinson v. Daly,* 96 N.W.2d 897, 898 (N.D.1959); *Ford v. Adkins,* 39 F.Supp. 472, 474 (E.D.Ill.1941).

■ Although plaintiff asserted that Vacanti held a judgment lien against the property, plaintiff offered no proof to substantiate its claim. In fact, all of the available information contradicts this assertion. None of the title searches filed with the court indicated Vacanti ever held a lien on the property. The Vacanti judgment itself established that it was against the Biancos and the Broomes personally—not against BBC or R.R.A. as a corporate entity. A corporation and its shareholders are distinct entities with separate liabilities. *See* 18A AM.JUR.2D *Corporations* § 42 (1985). A corporation's property is vested in the corporation, not in its stockholders or officers. *See Id.* §§ 42, 749. Stockholders cannot encumber corporate property. When a corporation owns property, the ownership cannot be attributed to the shareholders individually without first assailing the validity of the corporation directly. *See Id.* § 749. Because the Biancos and the Broomes did not own the property at issue as individuals, Vacanti's judgment against them as individuals could not have created a lien against any corporate property.

■ Even were plaintiff somehow to establish that the Vacanti lien was on the corporate property, a lien which the holder has not executed within five years from the date of the judgment ceases to operate as a lien upon the estate of a judgment debtor. NEB.REV.STAT. § 25–1515 (1990). Because Vacanti obtained its judgment lien against the Biancos and the Broomes in November 1982, the lien would have ceased to exist under applicable Nebraska law before the parties initiated the purchase agreement.

■ FNB assigned all its "right, title, and interest" in the property to SBA. A valid assignment transfers all interest of the assignor to the assignee so that the assignor no longer has any rights in the property. *See* 6 AM.JUR.2D *Assignments* § 1 (1963 & Supp.1991). An assignor who has assigned all his rights in a property need not be joined in an action involving the property because he has no interest to protect. *Huntington Towers,* 443 F.Supp. at 319–20. FNB assigned all its rights in the property. It had no interest to protect, and was not a necessary party.

■ Plaintiff declared that FNB's assignments of the mortgage, notes, and subordination agreement to SBA were ineffective because they showed "no consideration." By making this assertion, plaintiff apparently was suggesting that FNB still had some right to make a claim upon the property, thus placing a cloud upon the

title. Plaintiff's assertion is absurd. Until foreclosure, mortgages and promissory notes are choses in action. 7 WORDS & PHRASES 177, 179 (1952 & Supp.1990) (citing cases). A chose in action is a right to receive or recover debt or money through contract, or through a suit at law. BLACK'S LAW DICTIONARY 241 (6th ed.1990). An assignment of a chose in action is valid after delivery even though made without consideration. 6A C.J.S. *Assignments* § 60 (1975 & Supp 1991); 6 AM.JUR.2D *Assignments* § 90 (1963 & Supp.1991); *See also* RESTATEMENT (SECOND) OF CONTRACTS § 332(1) comment b (1981). Because FNB delivered the mortgage, subordination agreement, and notes to SBA, SBA need not show consideration to claim a valid assignment.

Even were this not the case, plaintiff's argument would fail. The consideration for an assignment need not appear on its face. Consideration may be proven by parol evidence, inferred from the agreement, or implied. *See* 17 C.J.S. *Contracts* § 73 (1963 & Supp.1991). Consideration is sufficient if there is any benefit to the promisor or any detriment to the promisee. RESTATEMENT (SECOND) OF CONTRACTS §§ 71, 332(5) (1981); *Abraham v. Abraham*, 203 Neb. 384, 390, 279 N.W.2d 85, 88 (1979). As guarantor of FNB's loan to BBC, SBA promised to pay BBC's debt to FNB if BBC defaulted on its loan from FNB. By fulfilling its promise, SBA obviously gave valuable consideration in return for FNB's assignment of the mortgage, subordination agreement, and promissory notes. *See, e.g.,* 6A C.J.S. *Assignments* § 61.

Furthermore, FNB's assignment of the mortgage to SBA, contrary to plaintiffs assertion, clearly stated that it was for "good and valuable consideration, the receipt of which is hereby acknowledged." A recital of consideration in an assignment is prima facia evidence of such consideration, in the absence of evidence to the contrary. *See* 17 C.J.S. *Contracts* § 73. Plaintiff has offered no evidence to the contrary, nor can it. An assignment, even if gratuitous, is irrevocable if accompanied by a writing customarily accepted as evidence of the right assigned, or if it is in writing, and either signed or delivered by the assignor. RESTATEMENT (SECOND) OF CONTRACTS § 332(1) (1981). Each of FNB's assignments to SBA was accompanied by signed writings fully manifesting FNB's intent to make a present transfer. FNB delivered them to SBA, and SBA recorded them. Therefore, plaintiff's assertion that the assignments were ineffective is totally without merit.

Plaintiff failed to come forward with any evidence to indicate that R.R.A./BBC, the Broomes, Vacanti, or FNB had any interest in the property, or that they could project any clouds upon the title. Rather, insurmountable facts show a clear, clean chain of title from the Marchios to BBC/R.R.A. to SBA. Plaintiff's bald-faced, patently false assertions do not demonstrate the existence of any genuine issues of material fact for trial.

C. The Purchase Agreement Was Not an Adhesion Contract.

Plaintiff argued that the agreement was an adhesion contract because it was prepared by SBA with "no input" from plaintiff. Plaintiff apparently forgot that by submitting the high bid at the sale, it had substantial input—it established the contract price. An adhesion contract is a form contract drafted unilaterally by one enterprise and forced upon another on a "take-it-or-leave-it" basis. *Sall v. G.H. Miller & Co.,* 612 F.Supp. 1499, 1506 (D.Colo.1985). Even had the contract been offered on a "take-it-or-leave-it" basis, plaintiff would need to show more to prove adhesion. First, plaintiff must show a great disparity in the parties' bargaining power. Second, plaintiff must show that it was not given an opportunity for input or negotiation. Finally, plaintiff must show that it could not have obtained adequate property elsewhere. *Id.*

Plaintiff offered no proof or evidence that it had inadequate bargaining power. On the contrary, because plaintiff's business was buying, selling, and renting real estate, it should have had more than adequate bargaining power, and it offered no

proof that it did not. Because plaintiff established the contract price, it cannot now say that it had no input. Finally, plaintiff offered no evidence to show that it could not have obtained property elsewhere. There is a total failure of evidence on plaintiff's part to support its argument that the agreement was an adhesion contract. This argument, as others, is specious, constituting nothing more than a feeble attempt to create a genuine issue of material fact where none exists.

## D. The Contract Was Not Ambiguous.

■ Plaintiff asserted, and it is commonly accepted, that when a form contract is prepared by one party, the court must construe ambiguous provisions against the drafting party. *See, e.g.,* 17A AM.JUR.2D *Contracts* § 348 (1991); *Lang Bros. Inc. v. United States*, 20 Cl.Ct. 551, 554 (1990); *Long v. Magnolia Petroleum Co.*, 166 Neb. 410, 421, 89 N.W.2d 245, 252–53 (1958). Specifically, plaintiff pointed to the contract requirement that SBA deliver "title in fee simple." Plaintiff did not articulate precisely why it felt "title in fee simple" was an "ambiguous provision." The court assumes that plaintiff believed "title in fee simple" to mean "good and marketable title," a term which, arguably, could be amenable to more than one interpretation. However, the fact that plaintiff may interpret a contract term differently than defendant does not necessarily indicate that the term is ambiguous. *See* 17A AM.JUR.2D *Contracts* § 338; *Dynamics Corp. of Am. v. United States*, 17 Cl.Ct. 60, 63 (1989); *Nogg Bros. Paper Co. v. Bickles*, 233 Neb. 561, 563, 446 N.W.2d 729, 731 (1989). A contract is ambiguous only if, when read as a whole, it is unclear which meaning represents the true intention of the parties. *See Town of Port Deposit v. United States*, 21 Cl.Ct. 204, 211–12 (1990); *Nogg Bros.*, 233 Neb. at 563–64, 446 N.W.2d at 731.

■ When viewed in their plain and ordinary language, "title in fee simple" and "good and marketable title" are not ambiguous, they are terms of art. Plaintiff's subjective, unexpressed definition of the terms is irrelevant. Whether SBA had "good and marketable title" hinges on an interpretation of law, not the contract. A contract written in unambiguous language is not open to construction against the drafter or otherwise. 17A AM.JUR.2D *Contracts* § 337; *Nogg Bros.*, 233 Neb. at 566, 446 N.W.2d at 732. Because the contract was not ambiguous, the court has no reason to construe its terms against SBA.

## E. Liquidated Damages Were Proper.

■ Plaintiff claimed that the retained damages constituted "forfeiture," and cited cases indicating that forfeitures are enforced only when the facts, the law, or the direct language of the contract requires it. *See Lone Oak Farm v. Riverside Fertilizer*, 229 Neb. 548, 555, 428 N.W.2d 175, 180 (1988); *Plummer v. Fie*, 167 Neb. 367, 371, 93 N.W.2d 26, 29 (1958); *Long v. Magnolia Petroleum Co.*, 166 Neb. 410, 423–24, 89 N.W.2d 245, 254 (1958). Unfortunately for plaintiff, the facts, the law, and the contract do support SBA's retention of plaintiff's deposit as liquidated damages.

■ Parties to a contract may agree in advance to a sum representing liquidated damages for breach, without reference to the actual damages found at the time of breach, unless such agreement constitutes a penalty. *See Higgs v. United States*, 212 Ct.Cl. 146, 546 F.2d 373, 376 (1976). To determine whether a contract provides for liquidated damages or whether it imposes a penalty, the court must inquire whether (1) the parties intended liquidated damages or a penalty; (2) uncertainty or difficulty in ascertaining actual damages support the provision for liquidated damages in the contract; and (3) the amount of damages in the contract bears a reasonable relationship to actual damages which have occurred as a result of default. *Id.* at 376–77 (citations omitted); *Growney v. CMH Real Estate Co.*, 195 Neb. 399, 401, 238 N.W.2d 240, 242–43 (1976).

Here, the contract expressly provided for liquidated damages, not a penalty. Additionally, while the parties could have determined certain elements of damages at the time of execution (i.e., future real estate

taxes, loss of interest charges, costs of re-advertising the sale, and maintenance costs), other costs were not so easily ascertainable. For example, the amount of expenses incurred would depend upon the time required for resale of the property, and fluctuating real estate values would make it difficult to ascertain a future market price. *See, e.g., Higgs*, 546 F.2d at 377; *Growney*, 195 Neb. at 401–02, 238 N.W.2d at 243. Finally, SBA was not able to sell the property until May 1990, and the property was repurchased for $41,000 less than what plaintiff had agreed to pay. This loss alone far exceeded the $24,100 down payment SBA retained as liquidated damages.

By entering into the contract with full knowledge that it contained a liquidated damages clause, Nebco agreed to be bound by that clause. *See Reliance Ins. Co. v. United States*, 931 F.2d 863, 866–67 (Fed. Cir.1991). Because plaintiff did not offer any evidence to support its contention that the liquidated damages provision in the contract constituted a penalty, plaintiff failed to show a genuine issue of material fact requiring a trial.

## CONCLUSION

The court has found no genuine issues of material fact, nor has plaintiff offered any proof to substantiate the essential elements of its case. Plaintiff's contentions that SBA did not have marketable title, that the agreement was an adhesion contract, and that retention of the deposit constituted "forfeiture" are frivolous and totally without merit. The court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment. The Clerk of the court is directed to enter judgment dismissing the complaint. Costs to defendant as the prevailing party.

IT IS SO ORDERED.